THE VALENTINE.

(District Court, E. D. New York. July 7, 1904.)

1. SHIPPING—LOSS OF CARGO—NEGLIGENCE—STATUTES.

Where the owner of a vessel, while in her home port, permitted all of her crew to leave for the night, except the fireman, cook, and a deck hand, and permitted them to sleep without maintaining a proper watch, and the fires to be banked so that no steam was available to work the pumps in case of an emergency, he was guilty of negligence, rendering the vessel liable for loss of cargo by the sinking of the vessel from injuries caused by an ice jam, notwithstanding the Harter act (Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), providing that, if the owner shall exercise due diligence to make the vessel seaworthy and properly manned, he shall not be liable for negligence in the navigation or management thereof, etc.

Richards & Heald (Charles M. Hough and Artemas Ward, Jr., of counsel), for libelants.

Butler, Notman, Joline & Mynderse (Frederick M. Brown, of counsel), for claimant.

THOMAS, District Judge. Harris undertook to transport certain boxes of tomatoes from Pier 42, Brooklyn, to Pier 32, North river, and for that purpose caused them to be loaded on the steam lighter Valentine. On March 6th, upon reaching Pier 32, in the early evening, as the Valentine's master testified, there was a vessel across the end of Pier 32, obstructing his entrance to the slip which had been prepared for him on the southerly side thereof, and for that reason he went to Pier 42, where the lighter was made fast outside of a barge lying on the northerly side of the pier. Shortly thereafter the captain and engineer of the lighter went home for the night; leaving on the vessel the cook, the fireman, and a deck hand. The wind was at the time northwest,

but shifted from 10 to 11 p. m. to the west, and thence to the southwest, where it remained; its velocity decreasing during the night from 13 miles at 8 p. m. to from 6 to 7 miles during the early hours of the following morning, while the temperature ranged from 34 degrees above zero at 8 p. m. to 29 degrees at 5 a. m. of March 7th. Broken ice was floating in the slip, and made its way between the Valentine and the barge alongside which she was lying. Maxon, who was at once cook and deck hand, stated that before he retired, which was at about 9 p. m., he tried to poke out the ice between the Valentine and the adjoining barge, but was unable to do so, as it kept floating in. He said there were "good, large pieces, probably weighing couple hundred pounds, some of them, and some of them less." During the night Maxon felt the Valentine, "time and again, surging back and forward, and brought up pretty heavy against the scow we was moored alongside of. I decided not to get up to see what was going on, because there was a man supposed to watch. * * * Q. Was the surging merely rising and falling, or bumping? A. Bumping, as she smashed against the side of the other boat. Q. A strong jar, was it? A. Yes, sir." The deck-hand retired about the same time and slept. Another Norwegian—Olsen by name—was asked if he kept watch, and answered, "I kept the watch in one way, I did." His way was this: He went to bed at about 10 o'clock, but was in and out several times between 10 and 2 o'clock, but between 2 o'clock and the time of the sinking of the boat, which was about 4 o'clock in the morning, neither he nor any other person gave the slightest attention to the vessel. There was no steam in the boilers, so that the pump could not be worked. There was no way of sounding for water. By going below, the presence of water could be determined, but Olsen did not go below after 10 o'clock. Had he done so, the pumps could not be worked. The vessel sank. The men escaped, but much of the cargo was dumped overboard from beneath the fastened tarpaulin which covered it. Some of the cargo was rescued at the instance of the libelant's agent, who appeared early upon the scene the following morning, and some quite minor part of it was carried away by people who gathered it out of the slip. For the loss and injury to the cargo, the libel has been filed. Within a few days the vessel was raised, and later on a hole was discovered in the starboard side, in the neighborhood of her water line, as it would be with the cargo that she carried. The probabilities are that the ice between the two vessels, under the influence of the water disturbed by the wind and tide, together with the swells of neighboring vessels, caused the hole and the resulting accident. She was a very old boat, having been built in 1873, and rebuilt and repaired at various times thereafter, and was seaworthy, so far as the timber was concerned at the place where the hole was made. During the night the boat was practically deserted. She was substantially without a crew. She had no watchman, in any proper sense. The equipment for pumping the water was valueless, since it was inoperative. The negligence in the care of the cargo was gross.

The remaining question is whether the owners may be relieved by virtue of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]). Section 3 of the Harter act requires that the owner "shall exercise due diligence to make the said vessel in all

respects seaworthy and properly manned, equipped and supplied," and that in such case "neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners,  \*  \*  \*   be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried," etc.

The loss in the present case arose from fault in the management of the vessel at Pier 42, but the fault was not initiated there. At that place the lighter had no watchman during certain important hours of the night, and during his absence the cause of the sinking was at work, and the remnant of the crew awoke only to find the catastrophe present. But they slept according to a custom obtaining in their employment. Had there been a watchman awake, instead of asleep, he could not have sounded for water, but he could have gone below and looked for it, and discovered it if present. Had he discovered the leak, it may be that he could have rendered or procured aid. But if this were impossible, he could, under proper management, have started the pumps. But in the present case he could not have done this, for there was no steam, because the fires were banked. The water was cold, and it would have taken an hour and a half to get up steam. There was no engineer. There was no captain. The fireman was asleep throughout the whole night, and all this seems to have been according to rule. The master of the Valentine testified:

"Q. What is the customary mode of taking care of such a boat as the Valentine at night when she is not running? A. There is a certain amount of the crew that are supposed to stay around. The deck hand, cook, and fireman are supposed to stay around. The engineer and captain are always married men, and they go home at night when the boat is laid up; but they have a cook, deck hand, and fireman on, who are supposed to stay on board the boat. Q. Are you speaking now of the general custom, as you have known it for 25 years? A. Yes, sir; the general custom on all the lighters of New York Harbor. Q. Is it customary to maintain any person in charge, whose duty it is to stay awake? A. I have never known it to be. Q. Is it sufficient protection to have some person on board, even though he doesn't stay awake? A. It is for different reasons. For instance, the boat can be blowing off in the night, and nobody on board of her. The fireman knows enough to go down and regulate the fire, and oftentimes the boiler commences to blow, and you want somebody on board the boat that understands something, and that is why you always want somebody on board the boat that is familiar with the boiler. He can go down and regulate the fire, and see what is the matter. That is about the only reason why we ever keep anybody on board the lighters at night. The cook and deck hand generally stays on board."

Indeed, if the owner had equipped the vessel with a proper engine and boiler, he had suffered the practice to prevail of allowing it to become useless at night. If he had manned the lighter with proper engineer, captain, fireman, and watchman, which is improbable, he had unmanned the vessel by allowing the captain and the engineer to leave the vessel at night; and it seems that a watchman is not expected to remain awake continuously. When the lighter sprung aleak she had no commander, no engineer, no operative engine, no one to watch for the danger. If at the inception of the undertaking the lighter was "seaworthy, and properly manned, equipped, and supplied," at Forty-Second street she

was not properly manned, equipped, or supplied, and the owner apparently knew she would not be—did not expect her to be—for of a habitual practice of a vessel in her home port the owner may be presumed to have been aware. Indeed, one of the defenses is that what was done was done according to custom. But customary abandonment of equipment, departure of the crew, or disregard of service by the crew, does not create a right that may be asserted against cargo owners who confide their property to the vessel in reliance upon proper equipment and qualified crew. It is not understood that an owner is excused by the Harter act, if, after proper equipment and manning, he adopts a course of business that renders both inefficient. This is a case of a vessel without either proper equipment or manning at Pier 42, and it is so because the owner presumably consented that it should be so. Hence the negligent act of the crew and negligent condition of the lighter at Pier 42 must be regarded as premeditated and expected by the owner. The Harter act intends that owners may diligently equip and man their vessels and send them on their voyages, whereupon the shipowners and cargo owners must trust that their property will find safety in a vessel carefully provided and furnished, and in a crew vigilantly selected for their capacity and fidelity. But if the owners of the ship know that on the voyage, or at ports intermediate or otherwise, or on the seas, the fires will be banked, the water for steam allowed to get cold, and that the captain and engineer will go ashore, and the rest of the crew will go to sleep, and that there is no method of being forewarned of leaks, and that all equipment for avoiding injury therefrom will be rendered useless; and if the owners approve, suffer, or connive at such custom or practice, such vessel is not properly manned, nor do the owners intend that the initial equipment and crew shall perform the duties for which they are provided. If the Harter act was expected to absolve owners under such conditions, it goes beyond its present understood purpose, and allows them to make provision for negligent acts and omissions, and for undoing on the voyage what they have done before the voyage began.

Pursuant to these views, the libelant should have a decree.