## THE STEEL NAVIGATOR.

Circuit Court of Appeals, Second Circuit.
January 9, 1928.

No. 126.

**1. Shipping ⬤⟞⟞121(1)—Covenant of seaworthiness is measured by fitness for voyage when ship breaks ground.**

Covenant of seaworthiness is measured by ship's fitness in all respects to fulfill purposes of voyage contemplated when she breaks ground.

**2. Shipping ⬤⟞⟞121(1)—Covenant of seaworthiness held not to require ship, lifting damaged tapioca at Batavia, to break ground thereat with clean peak and tight manholes, because of contemplated stowage of latex therein at Singapore.**

Covenant of seaworthiness of ship, filling after peak at Calcutta with water, which overflowed and damaged tapioca theretofore lifted at Batavia, *held* not to require her to break ground at latter port with clean peak and tight manholes, because of contemplated lifting of latex, to be stored therein, at Singapore; it being sufficient if she became fit, as respects latex, which was canceled, at Singapore.

**3. Shipping ⬤⟞⟞121(2)—Failure to fasten covers of hold, in which tapioca was stowed, before filling after peak with water, held not to make ship unseaworthy.**

Failure to make fast manhole covers of hold, in which tapioca was stowed, before filling after peak with water to restore ship's trim following cancellation of latex, expected to be stowed therein, did not make ship unseaworthy, in absence of showing that it was apparent at port where tapioca was lifted that peak must be filled with ballast somewhere en route, if not filled with latex at next port; need for ballast depending entirely on cargo lifted at later ports and its stowage.

**4. Shipping ⬤⟞⟞124—Failure to fasten covers of hold, in which tapioca was stowed, before filling after peak with water, held fault in management.**

Failure to make fast manhole covers over hold, in which tapioca was stowed, after cleaning after peak for stowing latex, which was subsequently canceled, *held* a fault in management, even if performance of covenant of seaworthiness comprised such duty and was deferred until ship broke ground at later port, where after peak was filled with water, which overflowed and damaged tapioca.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel in admiralty by the Catz-American Company, Inc., against the steamship Steel Navigator, her engines, boilers, etc., for damages for injury to a parcel of tapioca en route from Batavia, Java, to New York. From a decree awarding damages, claimant United States Steel Products Company appeals. Reversed, and libel dismissed.

The facts were as follows: The ship lifted the tapioca at Batavia, consigned to New York. She had been on an outward voyage from Philadelphia to Japan, whence she returned to New York by stages, touching at Manila, Batavia, Singapore, and Calcutta, where the damage occurred. Being an oil burner, she had filled her after peak with oil, which she had burned before reaching Manila. Having been fixed to lift a cargo of latex, liquid rubber, at Singapore, she determined to stow it in the after peak, which required cleaning. The cleaning was partly done at Manila, but it was still necessary to wash the sides further and to rub them with oatmeal.

There were two entrances to the peak from the deck, both by manholes. One of these led from the main deck on the fantail, and the other from the 'tween-deck through a storage room aft of the after 'tween-decks hold. When used to stow oil or any other liquid, the manholes were made water-tight by screwing down iron covers upon the coamings by proper bolts, the interstices being filled by fiber gaskets. It was possible to fill the peak with water by pipes leading directly into it, not through the manholes; but no one could enter except through these. Whether it was proposed to pump the latex through these pipes, or through the manholes, did not appear.

The tapioca was stowed in the after main hold at Batavia, and rode safely until the ship broke ground at Calcutta. At Singapore she learned that the parcel of latex was canceled, and left that port with the after peak empty, as it had been from Japan on. On reaching Calcutta she lifted the bulk, four-fifths, of her cargo and upon the completion of her stow was found to be somewhat by the head. To restore her trim it was therefore determined to fill the after peak with fresh water. Whether the chief officer, who was in charge of this part of the ship's management, did anything to secure the manholes before the fill began, was a point in dispute. He testified by deposition that he sent the carpenter below with orders to do so, and got word from him that it had been done. After the anchors were weighed, he said that he went down himself and looked at the covers. In the protest made at Alexandria, nothing was said of the carpenter's failure to carry out these orders.

In fact the cover in the storage room had not been properly made fast, and, as the water rose in the peak above the level of the 'tween-deck, it leaked through into the storage room, and thence to the hold, where it wetted the tapioca, and thus caused the damage in suit.

The libelant's position was that, when the ship left Batavia, she was unseaworthy because the covers were not made fast and because this was a defect unknown to the ship's officers, though chargeable against her had proper diligence been used. Further, assuming that the beginning of the voyage was at Batavia, yet it was in stages, and the covenant of seaworthiness was renewed at each port. If so, at Calcutta she was not seaworthy, and this also was unknown to her officers. Hence in any event she was liable. The claimant answered that the fault was in management; the ship being well found with covers and gaskets, the manholes being known to be loose at Batavia, where the voyage began, and the failure to make them fast not being in any view a defect in seaworthiness when she left that port. It denied that the voyage should be divided into stages, and insisted that the covenant attached once for all at Batavia. The District Judge accepted the libelant's theory of the case and held the ship.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (L. De Grove Potter, John M. Woolsey, and John J. Heckman, all of New York City, on the brief), for appellant.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Crawley and James K. Symmers, both of New York City, on the brief), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge (after stating the facts as above). [1] The covenant of seaworthiness is to be determined when the ship breaks ground, and only then. The Edwin I. Morrison, 153 U. S. 199, 210, 14 S. Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 133, 134, 15 S. Ct. 537, 39 L. Ed. 644; U. S. v. N. Y. & O. S. S. Co., 216 F. 61 (C. C.

A. 2); Biccard v. Shepherd, 5 M. & W. 471; The Guadeloupe (D. C.) 92 F. 670. It is measured by her fitness in all respects to fulfill the purposes of the voyage as then contemplated. Hence, if applied with literal strictness, a ship must from the outset be fitted in hull and gear for every stage of her voyage when she first breaks ground. This would in many cases be an onerous and idle imposition, because the earlier stages of a voyage may not require what becomes necessary thereafter. Hence has arisen in England the doctrine of a voyage in stages, marked by ports of call. This, as we understand it, means no more than that, when the demands upon her change as the voyage proceeds, she satisfies her covenant if she is fit at any port for that leg of the voyage immediately following. Quebec Ins. Co. v. Com. Bk. of Canada, L. R. 3 P. C. 234; Dixon v. Sadler, 5 Mees. & W. 405 (Ex. Ch.). The doctrine has been chiefly applied in the case of bunker coal. Thin v. Richards, L. R. [1892] 2 Q. B. 141; The Vortigern, L. R. [1899] Pro. D. 140. Recently it has been recognized in this country. The Willdomino, 300 F. 5 (C. C. A. 3). We do not mean to throw any doubt on it, and for the purposes of this case we accept it as sound. However, it is essential to observe that, instead of imposing new burdens on the ship, it relieves her of what would otherwise be her duty, construed with verbal strictness. Especially is it necessary to remember that the measure of what can in any event be demanded of her is her fitness for the whole voyage as contemplated at the outset. Adjustments made necessary by subsequent events pertain to her management and cannot touch her seaworthiness.

[2] At Batavia the ship at bar contemplated lifting the latex at Singapore. Were her covenant to be interpreted literally, she would therefore have been obliged to break ground at Batavia with a clean peak and tight manholes. Plainly this would be an unreasonable requirement; it was enough if, at Singapore, she became fit as respects the latex. However, it was her duty, either at Batavia or at Singapore, so to prepare. For the moment we ignore the question how far the knowledge of her officers would in any event put a default into the category of mismanagement. She was, however, seaworthy in all other respects, as she rode, because an open manhole in her 'tween-deck did not impair her ability to meet wind and sea. The case is quite different from an open port. International Nav. Co. v. Farr, 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Man-

itoba (D. C.) 104 F. 145; The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241.

[3] At Singapore the latex was canceled, and nothing substituted. Whatever her unfitness at Batavia, assuming the strictest interpretation of her duties, her failure to make fast the covers could not make her unseaworthy in respect of a matter which had not been material to her obligations before Singapore, and in view of the cancellation remained equally so thereafter. There is but one possible exception to this, and on it the case might turn. If it had been inevitable at Batavia that, if she did not lift the latex at Singapore, she must either there or at Calcutta fill her peak with water-ballast, then it might plausibly be argued that her purposes at Batavia contemplated filling the peak at some time, and, if it was not fit at Batavia, it must be made so at Singapore, at Calcutta, or wherever the necessity arose. That is the utmost which could be imposed upon her; we need not say that her duty went so far. The Manitou (D. C.) 116 F. 60, affirmed 127 F. 554 (C. C. A. 2), may be thought to be an authority for such a holding, since it is reasonably to be contemplated that a winch must be used on any voyage.

However, in fact it is not true that at Batavia it was apparent that the peak must be filled with ballast somewhere en route, if it was not filled with latex. On the contrary, the need for ballast depended entirely upon the cargo lifted at later ports and its stowage. It does not even appear that the ship's commitments were known or fixed at Batavia, and certainly it does not appear that there was a stowage plan prepared in advance. The need of ballast arose when she was found to be by the head after the stow was completed at Calcutta. It depended upon the cargo lifted and its disposition in the ship; when all the stow was complete, she might equally well have been by the stern or in trim. Her final trim was in the strictest sense a matter of her management. Moreover, it was not a matter of stowage; for ballast, unlike cargo, is not stowed. Thus The Persiana, 185 F. 396 (C. C. A. 2), is not in point.

[4] Therefore on no view could the default affect her seaworthiness, even if unknown to her officers at Batavia, or at Singapore. In fact, it was necessarily so known. The peak was not ready to receive the latex, and must be entered and cleaned. This could only be done through the manholes, and these must be made fast after it was completed. This the officers knew at Batavia; they knew it had not been done at Singapore. They con-

tinued to know it at Calcutta; so that, even though performance of her covenant of seaworthiness had comprised this duty, and were deferred till she broke ground at that port, it was still a fault in management. Indeed, we see no sufficient reason to discredit the chief officer's testimony of what took place at Calcutta, which, if believed, is conclusive; but that is a question of fact, which we may ignore.

Decree reversed; libel dismissed, with costs in both courts.