**THE PRESIDENT.**

**L. C. LEONARD LUMBER CO., Inc., v. MALLORY S. S. CO.**

District Court, S. D. New York.
July 22, 1931.

Neil P. Cullom, of New York City, for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Ray Rood Allen and Norman M. Barron, both of New York City, of counsel), for claimants.

KNOX, District Judge.

The facts giving rise to this suit, as stated by claimant, are as follows:

"W. T. Smith Lumber Company shipped by claimant's S. S. Agwistar 5,244 pieces of yellow pine decking and lumber from Mobile, Ala., under a bill of lading issued January 30, 1926 consigned to libellant at New York, 'Route Lighterage Limits' (claimant's Exh. A).

"On February 2, 1926, three days before the Agwistar's arrival, claimant requested delivery instructions from libellant. Mr. Leonard, libellant's president, directed delivery to Church E. Gates & Co. at Oak Point, 152nd Street and East River, and confirmed his instructions by letter the same day (claimant's Exh. B).

"Accordingly, the claimant reconsigned the shipment to Church E. Gates & Co. at Oak Point and made the necessary alterations in its transfer shipping order (claimant's Exh. F).

"The Agwistar, on arrival at New York early on February 5, 1926, was berthed on the south side of Pier. 38, North River, bow out. About 10 A. M. discharge of the lumber to the lighter Margaret B., chartered by libellant, (Exh. D) was commenced.

"By 6 P. M. on February 5, 1926, approximately 180,000' was stowed on the Margaret B. The balance of 16 odd thousand feet from another hatch was discharged by 3 P. M. on the same day to the claimant's help-out lighter Beaumont, which was then berthed· at the south side of Pier 37. *The lumber on the Beaumont was to be transferred to the Margaret B., on February 6, after which the Margaret B. would be towed to Oak Point to deliver the entire bill of lading shipment.*

"Shortly after Captain Grago came on duty at 6 P. M. on February 5th, claimant's tug President took the Margaret B. in tow astern on short hawsers from alongside the steamer and proceeded with her around and into the slip between Piers 36 and 37 and berthed her for the night at the south side of Pier 37 about 75 to 100 feet in from the end of the pier.

"There was considerable floating ice in the river, in the slips and at the ends· of the piers when the Margaret B. was taken in tow (claimant's Exh. H). The evening was clear, wind moderate N. W. (about 20 m. p. h.) and tide strong ebb, the 'Table of Currents in New York Harbor' indicating that the current down the river at 6:30 P. M. on February 5 was at the rate of approximately 2 knots per hour.

"After making up the tow in the usual and proper manner as above described, with the bow of the lighter about 5 feet from the stern of the tug, so that the tug would serve as a wedge to keep floating ice away from the lighter, the President went ahead slowly and gradually headed downstream. When off Pier 37, Captain Grago commenced to turn the tug inshore, thereby allowing the lighter to be swung around and downstream in the strong ebb tide and to come up with her starboard side against the end of Pier 36 or the ice lying there. The tug placed the Margaret B. at the south side of Pier 37, where the lighter captain, Jorgensen, made fast his lines to the pier.

"A few minutes after the tug left, Jorgensen went below with his lantern to examine the hull of the lighter before retiring for the night. He at once discovered that the Margaret B. was filling rapidly, and heard water rushing in. He ran to the end of Pier 37 and called to Captain Crago to come to his assistance. The President immediately put back to pier 37 but before reaching the Margaret B., she careened and the larger part of the lumber slid off into the slip. The lighter sank 'decks to' almost immediately and the President placed two lighters across the entrance of the slip in order to facilitate salvage of the cargo.

"On February 17, 1926, after salvaging as much of the cargo as possible, delivery was made by Mallory lighters King and Beaumont to Church E. Gates & Co. at Oak Point, where the consignee (Gates) signed the delivery receipt for the bill of lading quantity 'more or less' and paid the total collect freight amounting to $2,037.30 (claimant's Exh. F).

To the foregoing it should be added that under claimant's filed tariffs, and which were applicable to the movement of the 'lumber from the ship's side to a point outside the lighterage limits, no provision was made that claimant should be entitled to exemptions set forth in the Harter Act. The only specifications at all applicable to the present situation were that claimant should not be responsible for damage to lumber by stain or wet, and that shipments of lumber and ties were handled only under shipper's consent, and no responsibility was to be assumed for the correctness thereof.

■ Item 7 of the tariff entitled, "Extra Towage Charges," reads in part as follows: "Deliveries to points shown in ‹ this item" (that is, beyond 'Seventy-Sixth street on the North River and Sixty-Third street on the East River, New York City) "will be undertaken at the convenience of the ship; and if the point of delivery is not accessible at time of arrival of lumber at New York, N. Y., the owners of lumber will be required to take delivery from the ship at New York, N. Y."

It will thus be seen that there was no compulsion on the part of the ship to undertake the carriage of the lumber beyond the prescribed lighterage limits, and it might require the consignee to accept delivery alongside the Agwistar. From this it is fairly clear that transportation of the lumber from the ship to a point outside lighterage limits was not to be governed by the original bill of lading, and that it represented a new undertaking for which an additional charge was made and paid.

■ Under these conditions, the case seems to be brought squarely within the ruling of the Circuit Court of Appeals for this circuit in Ralli v. New York & T. S. S. Co. (C. C. A.) 154 F. 286, 287, where upon substantially similar facts it was said: "Manifestly this section [section 3 of the Harter Act (46 USCA § 192)] deals with a specific vessel; i. e., the vessel on which the merchandise is

being transported. When the entire transportation is made up of successive stages by successive vessels, this section applies to the particular vessel whose navigation or management has been faulty or erroneous." In the case at bar, then, I am concerned, not with the Agwistar, but with the Margaret B and the tug President. Here, as in the Ralli Case, "respondent cannot claim the benefit of the section * * * for the reason that the voyage had not commenced, the cargo was not yet all on board, nor the vessel ready to sail. * * * The language of the section so clearly contemplates a distinction between the preparation for a voyage, and the management of the same after it has begun, that, in the absence of adverse authority, we feel no hesitation in adopting this construction."

The pertinency of the opinion, from which the foregoing quotation is taken, is so apt that it is unnecessary to discuss the possible validity of claimant's defense had the transportation of the lumber from the Agwistar to the yard of Church E. Gates & Company at Oak Point actually been begun. As matters stood at the moment of the accident, the Margaret B, in tow of the President, was operating for the convenience of the claimant and not in the necessary course of discharge of a contract of carriage. This is established by the testimony of Barton, transfer agent of the respondent. Indeed, claimant's brief summarizes this feature of the case thusly: "Crago and Beckvar explained fully why the lighter was berthed at Pier 37. About 3 P. M. on February 5, the help-out lighter Beaumont with about 16,000 feet of the lumber was placed at the south side of Pier 37. This small quantity of the lumber was to be transferred to the Margaret B to be placed also at the south side of Pier 37 so as to effectuate the transfer."

Until the Margaret B was in readiness to fulfill the engagement safely to transport the cargo, the claimant was in no position to claim the exemption provided by section 3 of the Harter Act (46 USCA § 192), whatever may have been its rights once the barge had started to 132d street and East River.

The evidence in the case being such as to show negligence on the part of the President in handling the Margaret B, libelant may have a decree for such damages as resulted from the accident, excluding such portion thereof as arose from stain or wet.