## MAY v. HAMBURG–AMERIKANISCHE PACKETFAHRT AKTIEN-GESELLSCHAFT.

### No. 97.

Circuit Court of Appeals, Second Circuit.

Feb. 14, 1933.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and F. Herbert Prem, both of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight, John W. Griffin, and Wharton Poor, all of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Alleging that it paid, under duress, sums of money as security for general average contribution, these libels are filed by appellant, as assignee for cargo owners. A special commissioner's report in favor of the appellee was confirmed by the court below.

The ship Isis, of 7,000 tons dead weight, equipped with twin screws and driven by engines of a total of 2,400 horse power, carried

cargo for appellant's assignors for Bremen, Hamburg, and Antwerp. It is not questioned that when the vessel left her loading ports on the Pacific Coast she was seaworthy, properly manned and equipped. On her way to Bremen, Germany, the first port of discharge, she stranded in the Weser river, and, in clearing, her stern swung across the channel, striking the opposite bank; the blow doing damage to the port side of the rudder, resulting in a twist of 45° in the rudder stock. She resumed her way up the Weser, and developed a tendency to sheer to starboard. Tugs assisted her to Bremen. This stranding was due to negligence in navigation. While at Bremen, her rudder was examined by a diver, who found nothing wrong with it. She was then drawing 18' 6" of water forward and 23' 3" aft. When dry-docked, the water in the dock was lowered sufficiently to uncover all but 3 or 4 feet of her rudder. The marine superintendent of the appellee took charge, and, with others, inspected the ship. They found the twist in the rudder stock, but the rudder blade was found to be fair and straight as to that part which was above water, and the submerged portion appeared to be in equally good condition. The examination was by hand, boat hook, and was assisted by electric searchlight. Repairs were not made to the rudder stock, and she was directed to proceed to Hamburg with the assistance of three tugs. The rudder was lashed by wires led to the quarter bitts and set up with tackles, and the quadrant was secured by one or more set screws. She proceeded at night down the stream against a flood tide. As the vessel proceeded, the Lesum river enters from the east or the starboard side, and the Weser bends sharply to the west or port, at a point between the points known as seventeenth and eighteenth kilometers. As the Isis approached, the flood tide current was about 3 kilometers per hour setting up both rivers. A vessel bound up the river was sighted at this bend, and the Isis was navigated to starboard. She passed the other vessel near the seventeenth kilometer, but before she was entirely clear of this vessel she sheered to starboard, although the tugs used their utmost efforts to avoid it, and her engines used like efforts, and, while out of control, she was caught by the current on the port bow in such a way as to strand hard and fast amidships on a sand spit at the junction of the Weser and the Lesum rivers near Vegesack at about 3:50 a. m. To release the vessel, it was necessary to make sacrifices, and it is this, together with the expense incurred consisting of the assistance of

tugs and the lighterage of the cargo, which forms the subject of the claims of general average. The ship was damaged and repairs were necessary. The entire cargo was discharged and delivered by transshipment to destination. Before delivery of the cargo to the consignees at destination, the appellee obtained deposits to secure payment of general average contribution from each cargo owner for the sacrifices and expenses due to both strandings.

The cargoes in question were shipped under a bill of lading which provided:

"General Average shall be payable in accordance with the York-Antwerp Rules 1890 and at carrier's option as to matters not therein provided for in accordance with the laws and customs of the Port of New York. * * * If the carrier shall have exercised due diligence to make the vessel in all respects seaworthy and to have her properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting from fault or error in navigation or in the management of the vessel, or from any latent or other defect in the vessel, or machinery, or appurtenances, or from unseaworthiness, although existing at the time of shipment or at the beginning of the voyage (provided the defect or unseaworthiness was not discoverable by the exercise of due diligence), the shippers, consignees or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect to the cargo, and shall contribute with the carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril. * * * The shipowner is entitled to require a deposit in any of these three currencies."

The Punta Arenas cargo was shipped under a form of bill of lading providing:

"General Average, if any, to be adjusted at the Company's option either at Bremen/Hamburg or at final Port of Destination; always according to York-Antwerp-Rules, and as to matters not therein provided for, according to the usages of the place where the adjustment is made up. * * * For this purpose the Owners are bound to declare, if required, the value of the goods and no goods will be delivered without security having been given by the Owners for the due payment of such General Average. Default, Error, Neglect in judgment or mistake of the Pilot, Master or the Crew in the navigation of the Ship, Defects of the Vessels or her En-

gines not noticed before and occasioned during the voyage shall not release the Owners from such contribution."

■ The latter bill of lading, it will be noted, does not have an express condition that due diligence must be used to make the vessel seaworthy, and this form is different from the usual Jason clause with which the first form is identical. The appellant contends that the shipowner cannot recover from the Punta Arenas cargo a general average contribution to sacrifices resulting from negligent navigation or unseaworthiness, because the absence of the due diligence provision has the effect of invalidating the entire general average clause. He refers to The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130, and The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969. In The Irrawaddy Case, the validity of the general average clause was not questioned, and the court decided that the Harter Act (46 USCA §§ 190–195) alone did not entitle the owner to share in the general average rendered necessary by negligence in navigation. This was referred to in The Jason, 225 U. S. 32, 54, 32 S. Ct. 560, 56 L. Ed. 969, where an agreement provided that, if the owner had exercised due diligence to make his vessel seaworthy, he should be entitled to share in general average rendered necessary by negligence in navigation. It was held valid, and the owner was entitled to recover a contribution arising out of a negligent stranding. The court pointed out that, so far as the Harter Act relieved the shipowner of responsibility for the negligence of the master and crew, it is no longer against the policy of the law for him to contract with the cargo owners for a participation in general average contribution growing out of such negligence. Thus the shipowner may contract exemption in so far as such is not in violation of the Harter Act. The prohibition of the Harter Act against bill of lading clauses relieving from liability for negligence in the care and custody of cargo limits but does not invalidate general exemptions, and "the proper construction of such general language restricts it to cases where the carrier is not at fault for negligence or failure of due care." Cunard S. S. Co. v. Kelley (C. C. A.) 115 F. 678, 686; Compania de Navigacion La Flecha v. Brauer, 168 U. S. 104, 123, 18 S. Ct. 12, 42 L. Ed. 398.

The Punta Arenas bill of lading must be construed as impliedly containing the restrictions of the Harter Act and as such be enforced. Therefore the effect of the general average provisions of both bills of lading is substantially the same, and it becomes unnecessary for us to consider separately whether the cargoes under these two forms are to be regarded as under bills of lading not containing the Jason clause above.

■■ The bills of lading raised the questions of the effect of (a) negligent navigation; (b) management by the agents of the shipowner other than the master and crew of the vessel; (c) due diligence; and (d) seaworthiness at the time of the commencement of the voyage and later at Bremen after the first stranding. The first form of bill of lading required the shipper to contribute to general average if damage was caused by fault or error in navigation or management and if the shipowner exercised due diligence to provide a seaworthy vessel. The finding below that the second stranding was caused by the pilot's error in navigation we think justified by the evidence. But the shipowner did intervene at Bremen through its marine superintendent, for it was he, rather than the master of the ship, who decided to send the ship out of Bremen under tow. The master was consulted, but the marine superintendent made the final decision. If sending the ship forward under tow was an error causing the damage, it would, in any case, be one of management or judgment covered by the exception in the bill of lading.

But the question of error of judgment or management is claimed to be important in determining whether or not the provision of seaworthiness of the vessel is applicable if we regard the start from Bremen to Hamburg as a new departure. It was not questioned but what the ship was seaworthy when it left its last loading port. When it broke ground, it satisfied all requirements of seaworthiness and due diligence under the terms of the bill of lading. The Elkton, 49 F.(2d) 700 (C. C. A. 2); The Steel Navigator, 23 F.(2d) 590 (C. C. A. 2). When a voyage is undertaken in stages, the strict requirement that a vessel be seaworthy when it breaks ground is fulfilled by equipping the vessel at each stage for the next leg of the voyage. The Steel Navigator, supra; The Oritani (D. C.) 40 F.(2d) 522. But permitting the owner to supply at stages of the voyage equipment known to be required at its inception does not mean that damages incurred during the voyage must be repaired by the owner at an intermediate port of call or that failure to do so violates the requirement of seaworthiness. Failure of the master or the agent of the owner to make such repairs is an error in management. The Milwaukee Bridge, 26 F.

(2d) 327 (C. C. A. 2); United States v. N. Y. & O. S. S. Co., 216 F. 61 (C. C. A. 2); The Guadeloupe (D. C.) 92 F. 670.

Even if there were intervention of the owner at Bremen, through the marine superintendent, that did not require it to make the ship seaworthy for the next stage of the voyage to avoid the charge of unseaworthiness as stated in the bill of lading. Was the ship seaworthy when it left for Hamburg? Seaworthiness, a relative term, depends upon the circumstances surrounding each undertaking. A vessel under tow may be regarded as seaworthy if the tugs are powerful enough to tow the vessel, even though she is not navigated under her own power. The appellant contends that the ship sheered to starboard and stranded (the second time) because her rudder blade was bent as a result of the first stranding. The bend in the rudder was found to be about 5°, and, assuming that this existed due to the first stranding and was not repaired at Bremen, still it would not account for the second stranding. The captain and mate of the vessel and the captain of the towboats testified that there was no difficulty experienced in steering the vessel on the way down the river until the junction of the Lesum was approached, and, in so doing, they navigated through several bends in the channel in both directions. At the investigation and according to the report of the Seeamt (a German board of inquiry), statements were made by witnesses which would indicate that the bend in the rudder affected the steering, but before the commissioner, where both parties had full opportunity to examine, it was established that it had no effect upon the navigation of the vessel. If there were a bend in the rudder, the evidence satisfactorily establishes that a competent navigator could not have failed to discover the effect. As the vessel proceeded before the stranding, the three tugs were found below to have been going full speed ahead. But, as found below, the power of the vessel and her tugs was employed to correct any tendency to sheer, which would affect the navigation or control of the vessel. There was a sheer in the direction of the bank, and that was the probable consequence of the bend in the river and current, and, even with the assistance of the towboat, this was not overcome. It was expressly found that unseaworthiness, if any, with respect to the steering gear of the vessel, did not cause or contribute to this second stranding.

However, the question is presented as to whether or not the fact that the vessel was unable to proceed from Bremen under its own power and required the assistance of tugs justified classifying her as unseaworthy in continuing on this leg of her voyage. Those in charge of the vessel determined that it was not safe for her to proceed under her own power, and called to her assistance these towboats. The bills of lading, expressing the contract between the parties, consented to liability for general average only if the vessel were seaworthy. Of course, such a contract must impliedly contain the willingness of the cargo owner to consent to towing when necessary, such as in an instance when a vessel is docked or where navigation alone is insufficient or not safe. The cargo owners might reasonably have intended by their agreement to have accepted the transportation of their cargoes to Hamburg, assuming the risk of general average charges, if the vessel did so under its own power, but not if she became damaged so as to require the assistance of tugs. We have held that, while the Harter Act requires an owner to provide a ship that is in all respects seaworthy before he can take advantage of the exemption under the act, this requirement affects only causes of action for damages resulting from unseaworthiness. Hartford & N. Y. Transp. Co. v. Rogers & Hubbard Co. (C. C. A.) 47 F.(2d) 189, 192. There we said: "It is not enough to displace the contract of affreightment and to deprive the vessel of the exemptions of the Harter Act that she was unseaworthy, if the damage was not caused by the unseaworthiness." See The Malcomb Baxter, Jr., 277 U. S. 323, 48 S. Ct. 516, 72 L. Ed. 901; The Thessaloniki, 267 F. 67 (C. C. A. 2); Boston Marine Ins. Co. v. Met. Redwood Lumber Co., 197 F. 703 (C. C. A. 9); The Turret Crown (D. C.) 282 F. 354.

Concededly the vessel had her rudder stock twisted and the lower half of the rudder blade was deflected to starboard 5°. She had her rudder secured amidships and was in tow of three tugs, one on a hawser ahead and one tug lashed to either side. The tug ahead had 1080 horse power, those on the sides about 800 each, and, while it is true that the bend in the rudder blade was not found below to have occurred at the time of the second stranding, this is based upon the claim that there was no evidence that the rudder struck anything on the port side. But be that as it may, it is not important, for the reason that competent navigators testified that a 5° bend would not affect the steering except to a slight extent. Thus we have a vessel proceeding on her voyage from Bremen crippled and assisted. The fault in navigation which resulted in her stranding was the fault of the

pilot, not of the master of the vessel. Under these circumstances, the vessel was not seaworthy. But within the terms of the bill of lading the cargo owners accepted this risk when they agreed that the cargo might be charged with general average in the event of negligent navigation of the ship. The courts have held that, where the vessel is concededly seaworthy when she sails on her voyage and becomes unseaworthy due to storm, and it is not sufficiently corrected by those in charge at an intermediate port, the owner is not deprived of the defenses under section 3 of the Harter Act (46 USCA § 192). The Milwaukee Bridge, 26 F.(2d) 327 (C. C. A. 2); United States v. N. Y. & O. S. S. Co., 216 F. 61 (C. C. A. 2); The Guadeloupe (D. C.) 92 F. 670.

The appellant contends that the owner of the vessel intervened here by the action of the marine superintendent, who took charge of the vessel at Bremen and made the decision as to sailing from that port without repairs. The argument is that the entire voyage must be regarded as in stages, and that the vessel must be seaworthy at the beginning of each stage, citing The Valentine (D. C.) 131 F. 352; The Willdomino, 300 F. 5 (C. C. A. 3). In the Valentine Case, the fault resulting in the loss while operating at destination was not initiated there, but at the inception of the voyage, and the owner was held liable because the default of the crew of the lighter related back to the nondelegable duty of the owner at the beginning of the voyage. In The Willdomino Case, the fault arose at the inception of the voyage.

The Isis was fitted for the voyage, and it was not intended that she would proceed in stages, and, when she sailed from Bremen, the owner's warranty of seaworthiness was thereupon performed and discharged. While we have accepted the stages of voyage doctrine, we have held that, if a vessel is seaworthy on sailing on her intended voyage, all repairs or adjustments made necessary by subsequent events pertain to her management and cannot touch her seaworthiness. The Steel Navigator, 23 F.(2d) 590 (C. C. A. 2); The Newport, 7 F.(2d) 452 (C. C. A. 9); The President Polk (D. C.) 40 F.(2d) 665; The Oritani (D. C.) 40 F.(2d) 522. The unseaworthiness of the vessel when she left Bremen would therefore not affect the contractual obligations of the bill of lading. The appellee had performed its obligation and duty under the Harter Act, and it was entitled to the protection of the Jason clause. We hold that the general average clauses in the bills of lading were effective and binding at the time of the second stranding, and that the general average was properly charged against the cargoes, and the deposits made as security in order to release the cargoes may not now be recovered.

Decree affirmed.