AMERICAN–WEST AFRICAN LINE, Inc., v. SOCONY VACUUM CORPORATION et al.

No. 13563.

District Court, E. D. New York.

Aug. 25, 1933.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for libelant.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and F. Herbert Prem, both of New York City, of counsel), for respondents.

CAMPBELL, District Judge.

This is a suit brought by American-West African Line, Inc., owner of the American steamship West Kebar, against the respondents herein, for contribution in general average in connection with certain losses and expenses sustained and incurred by the libelant, as a result of the collapsing of the furnaces in the vessel's center boiler in February, 1930, while she was at the port of New York.

The Vacuum Oil Company was the shipper of the cargo, which consisted of cases of oil and gasoline and drums of gasoline.

The Vacuum Oil Company executed a general average agreement, wherein it agreed that so much of the losses and expenses as upon adjustment of the same, to be stated by Johnson & Higgins, might be shown by the statement to be a charge upon the cargo, should be paid by it according to its ratable proportion thereof in and for settlement in accordance with the statement. The cargo of the Vacuum Oil Company is the only cargo concerned in this case.

The Vacuum Oil Company, some time after executing the bond, transferred its assets and liabilities to the Standard Oil Company of New York, which assumed all of its liabilities. The Standard Oil Company of New York then changed its name to Socony Vacuum Corporation, and the Socony Vacuum Corporation transferred all the assets and business which it had received from Vacuum Oil Company to Vacuum Oil Company, Inc., which assumed all of the liabilities of the former Vacuum Oil Company.

Both the Socony Vacuum Corporation and the Vacuum Oil Company, Inc., have been made parties respondent in this suit.

The other respondents are underwriters —apparently insurers of the cargo—which guaranteed the payment of all proper general average, salvage and/or special charges for which the goods are liable. The Vacuum Oil Company was a self-insurer as to part of the cargo, and also executed a general average guaranty.

The amount demanded in the libel is $5,759.20, which is the amount shown due from the Vacuum Oil Company in the general average adjustment prepared by Johnson & Higgins.

The respondent Globe & Rutgers Fire Insurance Company is in the hands of the superintendent of insurance of the state of New York, and an injunction has been issued against the filing of suits or the continuation of suits against it.

This suit, therefore, did not proceed as against the Globe & Rutgers Fire Insurance Company, and none of the findings herein bind it, and it is not represented before this court or bound by the decree that may be entered herein, but the suit proceeded against all the other respondents, the same as though the Globe & Rutgers Fire Insurance Company had never been made a party to this suit.

The parties before this court stipulated that the general average adjustment may be taken as a correct statement of accounts between the parties (with the exception of an item of $365.76 covering legal liability insurance) provided that the court finds that this case is a proper one for general average contributions.

The West Kebar is a steamship about 407 feet long, equipped with triple expansion reciprocating engines, and with three Scotch boilers. She was built in 1920. She bore the classification of A–1 in the American Bureau, which is the highest classification in that society. Alongside her name on the American Bureau Record appears the symbol of the Maltese Cross, indicating that the ship was built under the supervision of the American Bureau, and that her materials and machinery were tested to American Bureau requirements, and that she was subjected to special surveys during construction. She had been engaged in the West African trade for a number of years.

The West Kebar arrived in Boston from Africa on January 23, 1930, remaining there three days. She arrived in New York on January 27th and went to Carteret, N. J., where she discharged mahogany logs. She also carried a shipment of palm oil, some of

which was loaded in her after peak tank. She next went to Pier 38, Brooklyn, where she discharged the palm oil; the discharge being completed on February 3, 1930. She went to Robins Dry Dock, arriving there at 9:10 a. m. on February 11, 1930. She came off from the dry dock on February 13, 1930, but remained in the repair yard until February 18, 1930. On that day she left for Bayonne, N. J., in tow of tugs to load kerosene, gasoline, and lubricating oil for the Vacuum Oil Company. She continued loading at Bayonne until February 21, 1930, and left that day in tow of tugs for Brooklyn. She arrived at Pier 38, Brooklyn, at about 4:30 p. m. on February 21st, Saturday, February 22d, was Washington's Birthday, and no work was done on the ship on that day or the following day, Sunday, February 23d.

On Monday morning, February 24th, two tubes and a stay bolt in the center boiler were found to be leaking, and that boiler was cut out at 8 a. m. On February 25th furnace doors of the center boiler were opened for inspection, and it was found that the three furnaces in that boiler had collapsed and the inspectors were immediately notified. As soon as the boiler had cooled down sufficiently to permit an internal examination, Mr. Gledhill, superintending engineer of the libelant, and members of the engineering personnel of the ship, made a careful examination of the boiler and furnaces. They found indications of oil on the furnaces. The furnaces had overheated due to the presence of oil which acted as an insulator between the furnace metal and the water itself, causing the transfer of heat to be lost. Later on, a careful examination was made to ascertain where the palm oil had come from. Palm oil was found in the vessel's No. 4 port double bottom tank, where her boiler water was carried.

Subsequently several conferences were held at the libelant's office, which were participated in by representatives of the ship-owner, United States Salvage Association, the American Bureau, and the cargo interests, and it was decided that it was absolutely necessary for the safety of the ship and cargo that the cargo, which was of a highly inflammable nature, be removed, as it was necessary to use acetylene torches to move the deflected furnaces. The steamship West Lashaway, which was also owned by the libelant, was available, and it was agreed that the West Kebar's cargo should be transferred to the West Lashaway, and carried forward to Africa. The transfer of the cargo was completed on March 12th and the West Lashaway transported the cargo to Africa and there delivered it safely.

On March 5th, all the interested underwriters now before this court entered into an agreement with Johnson & Higgins, who were concededly the agents of the libelant, wherein it was recited that the three furnaces of the center boiler had collapsed, that the surveyors had recommended the renewal of the furnaces, and that the gasoline and kerosene be discharged to permit of repairs being effected, which gasoline and kerosene constituted about three-fourths of the cargo on board.

The agreement further recited that the owners had the West Lashaway available, and to save the expense incident to holding the West Kebar's cargo while repairs were being effected, they proposed transferring the whole of the cargo to the West Lashaway and forwarding it under the original bills of lading, to destination, without additional freight, in consideration of the underwriters agreeing that there be allowed in general average, in addition to the cost of discharging the West Kebar, the cost of loading her cargo into the West Lashaway, together with the damage to cargo sustained in the discharging and reloading operations, wages, provisions, fuel and engine stores, and such other general average allowances as would have been made to the West Kebar had her cargo been held and reloaded into her and taken forward by her.

All the interested underwriters now before this court signed the agreement.

Spelman, representing the Union Marine Insurance Company, Limited, signed the agreement, provided the case was shown to be one of general average. F. H. Cauty, representing Thames & Mersey Marine Insurance Company, Limited, and Talbot Bird & Co., on behalf of Eagle Star & British Dominions Insurance Company, Limited, simply signed the agreement with the letters "W. P." beside their respective signatures.

Thereafter Johnson & Higgins drew up a statement of general and particular average and completed the same on February 3, 1932.

The respondents now before this court refused to pay general average contributions, and as a result of their refusal this suit was instituted in November, 1932.

The libelant bases its claim upon a contract entered into between the libelant and the Vacuum Oil Company, dated November 14, 1929, which provided for the transporta-

**518**

tion of the Vacuum Oil Company's petroleum products on the libelant's vessels, and those of Messrs. Elder Dempster & Co., Limited, between January 1, 1929, and December 31, 1930.

Article 2 of the contract provided that all consignments of the shippers should be carried under deck, freighters being responsible for careless handling according to conditions of bills of lading, copies of which were stated to be thereto attached. The same article further provided that where the bill of lading conflicted with the terms of the contract, it was understood and agreed that the provisions of the contract were to govern.

■ The terms of the libelant's regular outward form of bill of lading, which was attached to said contract, thereby became an integral part of the contract.

The bills of lading for the cargo in question were not issued until the day after the accident, but the form attached to and which became an integral part of the said contract contained a clause reading as follows: "General average shall be adjusted and settled in New York and shall be payable according to the York-Antwerp Rules 1924, 1 to 15 inclusive, and Rules 17 to 22 inclusive, and as to matters not therein provided for according to the Laws and Usages of the port of New York. Average bond must be furnished with such security as may be required by Master or vessel's agent, before delivery of the goods. * * * "

Subdivision (b) of 1924 York-Antwerp Rule 10 reads as follows: "The cost of handling on board or discharging cargo, fuel or stores, whether at a port or place of loading, call or refuge, shall be admitted as general average when the handling or discharge was necessary for the common safety or to enable damage to the ship caused by sacrifice or accident to be repaired, if the repairs were necessary for the safe prosecution of the voyage."

Subdivision (c) of rule 10 reads as follows: "Whenever the cost of handling or discharging cargo, fuel or stores is admissible as general average, the cost of reloading and stowing such cargo, fuel or stores on board the ship, together with all storage charges (including fire insurance, if incurred) on such cargo, fuel or stores shall likewise be so admitted. But when the ship is condemned or does not proceed on her original voyage, no storage expenses incurred after the date of the ship's condemnation or of the abandonment of the voyage shall be admitted as general average."

■ While it may well be that, as contended by libelant, the terms of rule 10, subdivisions (b) and (c), of said York-Antwerp Rules, fit the present situation, if that rule be so construed that the effect is to relieve the vessel or the owners from negligence at the port of loading before the commencement of the voyage, as contended on behalf of libelant, then to that extent the agreement incorporating that rule would be invalid as against public policy, under the provisions of the third section of the Harter Act, title 46, § 192, U. S. Code (46 USCA § 192).

Prior to the passage of that act, it was the settled policy of this country not to permit any vessel or owner thereof which as a common carrier transported merchandise or property to or from any port of the United States of America to limit the liability of the vessel or owner for negligence (Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 S. Ct. 469, 32 L. Ed. 788), but by the third section of the Harter Act, supra, it was provided that if the owner "shall exercise due diligence to make the said vessel in all respect seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel."

The due diligence referred to in that act must be shown before the commencement of the voyage. The Consort (D. C.) 49 F.(2d) 406.

In The Irrawaddy, 171 U. S. 187, at page 189, 18 S. Ct. 831, 43 L. Ed. 130, Mr. Justice Shiras, writing for the court, said: "The answer we shall give to the question certified by the circuit court of appeals must be determined by the meaning and effect which should be given to the act of February 13, 1893 [c. 105, 27 Stat. 445 (46 USCA §§ 190–195)], known as the 'Harter Act.' Admittedly, upon the facts conceded to exist in the present case, the owner of the ship has no right to a general average contribution from the cargo, unless such right arises from the operation of that act." In that case there was no agreement as to general average.

In The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969, there was an agreement as to general average, which is now known as the Jason clause, and Mr. Justice Pitney, writing for the court, distinguished that case from The Irrawaddy, supra, and at page 55 of 225 U. S., 32 S. Ct. 560, 564, 56 L.

Ed. 969, said: "Since the clause contained in the bills of lading of the Jason's cargo admits the shipowner to share in the general average only under circumstances where by the act he is relieved from responsibility, the provision in question is valid, and entitles him to contribution under the circumstances stated."

Clearly the converse of this proposition must be true, and if as construed by libelant rule 10, subdivision (b), admits the shipowner to share in the general average under circumstances where by the act he is not relieved from liability, the provision in question is invalid and he is not entitled to contribution under the circumstances.

In The Isis, 63 F.(2d) 248, 1933 A. M. C. 390, the Circuit Court of Appeals of this circuit considered the Jason clause and its relationship to the Harter Act, and at page 394 of 1933 A. M. C., 63 F.(2d) 248, 250, Circuit Judge Manton said, referring to The Jason, supra: "The court pointed out that, so far as the Harter Act relieved the shipowner of responsibility for the negligence of the master and crew, it is no longer against the policy of the law for him to contract with the cargo owners for a participation in general average contribution growing out of such negligence. Thus the shipowner may contract exemption in so far as such is not in violation of the Harter Act."

Under the provisions of the third section of the Harter Act, the libelant was bound to use due diligence before the commencement of the voyage to make the steamer West Kebar seaworthy, and the burden was on the shipowner to show that he had used due diligence to make her seaworthy. The Lewis H. Goward (D. C.) 34 F.(2d) 791.

The testimony on this phase of the case took a wide range and need not be discussed at great length, but can be reduced to a narrow compass.

The palm oil entered the No. 4 double bottom tanks which contained the water for the boilers through a broken heating coil in the after peak tank. Complaint was made by the consignees that steam was finding its way into the palm oil, and after the discharge of the palm oil was completed, an investigation was made and the leaking joint was found and repaired.

Notwithstanding the fact that all engineers are familiar with the danger of oil entering a boiler, no investigation was made to determine whether any palm oil had found its way into the boiler water in No. 4 double bottom tanks. This was negligence and certainly did not show due diligence to make the ship seaworthy.

Furthermore, the oil had to go through the engineroom to get into the double bottom tanks, and in the engineroom there was maintained a tank with a glass to look through, for the purpose of observing if oil was passing through, and it was negligence on the part of the engineering force not to have observed the passing of the oil.

Libelant suggests that an exception be made to the rule, and that due diligence to make the ship seaworthy be required before the loading of the cargo before the accident, instead of before the commencement of the voyage.

No such exception can be made under the Harter Act. The Newport (C. C. A.) 7 F.(2d) 452; The President (D. C.) 52 F.(2d) 680, 682. But even if it could, it would not relieve the libelant, as the evidence shows that the oil which caused the collapsing of the furnaces in the middle boiler was in the boiler water in the No. 4 double bottom tank before the said cargo was loaded, and that at the time of loading the cargo, the ship was unseaworthy.

This is undoubtedly true notwithstanding the fact that the accident did not occur until some time after the repairs to the leaking coil had been made, and after the inspection of the center boiler had been made by Mr. Low, for the reason that in the movements of the ship between those times, the ship was not moved by her own power but by tugs, and it was not until she started to use her own power and use the injector that the shallow depth of the water was so stirred as to carry the oil into the boiler.

The libelant cites many cases to show that if these acts of negligence had happened at sea, or in port after the voyage had commenced, they would be held to be errors of management, which is undoubtedly true; but the answer is that they did not happen at sea, nor in port after the voyage had commenced, but before the commencement of the voyage, and they constitute negligence.

The movement of the West Kebar from one berth to another in the same harbor did not constitute the commencement of the voyage. There is a distinction between the preparation for a voyage and the management of the same after it is begun. Gilchrist Transp. Co. v. Boston Ins. Co. (C. C. A.) 223 F. 716.

I do not agree with the libelant that the contract in question was not a shipper's document such as was contemplated by sections 1 and 2 of the Harter Act (46 USCA §§ 190,

191); on the contrary, the contract was between carrier and shipper, and to such contract the act applies, but it does not apply to a charter party by which a ship is demised. Golcar S. S. Co., Limited, v. Tweedie Trading Co. (D. C.) 146 F. 563.

I disagree with libelant's contention with reference to the two respondents whose representatives placed the letters "W. P." after their names.

There is no general average to pay, as I have found that the libelant was not entitled to contribution in general average, under the circumstances of this case.

In the face of the common use of the words "without prejudice" following signatures in maritime matters, and the words used by those who signed before the two in question, it seems clear to me, without the necessity for further evidence, that they used these letters to express the same reservation as the former signers, much the same as they might have used *ditto* marks.

The libelant has failed to prove by a fair preponderance of the evidence that it was entitled to contribution in general average in this case, or that by reason of the general average agreement any of the signers of the agreement, who are now before the court, are liable to the libelant in any sum whatever.

The respondents except the Globe & Rutgers Fire Insurance Company, which was not before this court on this trial, are entitled to a decree dismissing the libel as to each and all of them, and, as all appear by the same proctors, to one bill of costs.

A decree may be entered in accordance herewith.

Settle decree on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Admiralty Rules (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.