**PACIFIC QUEEN FISHERIES et al.,**
Appellants,

v.

**L. SYMES et al., Appellees.**

**PACIFIC QUEEN FISHERIES et al.,**
Appellants,

v.

**ATLAS ASSURANCE COMPANY et al.,**
Appellees.

**Nos. 17460, 17461.**

United States Court of Appeals
Ninth Circuit.

Aug. 3, 1962.

As Modified Aug. 31, 1962.

Rehearing Denied Sept. 13, 1962.

Dow & Stonebridge, Wilbur E. Dow,
Jr., and W. Shelby Coates, Jr., New York

City, Happy, Copeland & King, and Robert W. Copeland, Tacoma, Wash., Lillick, Geary, Wheat, Adams & Charles, and Allan E. Charles, San Francisco, Cal., for appellants.

Stephan, Gorton, & Hemstad, and Albert E. Stephan, Seattle, Wash., for appellees.

Before POPE, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

This is a consolidated appeal taken after trial in the United States District Court in which judgment was entered for appellee insurance companies holding them exonerated from liability on certain contracts of insurance. Appeal No. 17,460 was formerly No. 2348 in the district court and was originally filed in the Superior Court for the State of Washington from which it was removed to the district court only to be remanded back to the State court. Appeal No. 17,461 was formerly No. 2543 in the district court; it was originally filed in the Superior Court for the State of Washington from which it was removed to the district court and a motion to remand was denied. After removal of No. 17,461 to the district court, appellants stipulated the then State court case could be retransferred to the Federal court, and moved to consolidate No. 2348 with No. 2543. The motion was granted and the two cases consolidated for trial. Diversity of citizenship existing, and an amount in controversy exceeding $10,000, the district court had jurisdiction to hear the consolidated cases under the provisions of Sections 1332 and 1441(a) of Title 28, United States Code.

Judgment for appellees in both cases was entered March 23, 1961. Timely notice of appeal was filed. This court has jurisdiction to review the judgment entered below under the provisions of Sections 1291 and 1294(1) of Title 28, United States Code.

Both actions were brought by appellants to recover from appellee insurance underwriters on contracts for marine insurance for loss and damage resulting from the total constructive loss of appellants' diesel powered fishing vessel, the Pacific Queen, owned by Pacific Queen Fisheries, a partnership.[1]

The Pacific Queen was built in 1943 for the Navy. The vessel had a wooden hull and structure with steel decks and deckhouse; she was 988 gross tons, 672 net tons, 173 feet in length, 37 feet in width, 18.8 feet in depth, and propelled by 1600 HP twin-screw diesel engines. Built for Navy salvage operations, she had been outfitted with two 1500 gallon gasoline tanks which were equipped with "a very safe" aqua or hydraulic system which dispensed gasoline by injecting water through interior piping into the tanks (thus forcing the gasoline of lighter specific gravity to rise) thereby transferring the gasoline through permanent piping to pumps and discharge valves, *located above deck*.

In 1948 the Pacific Queen was bought as war surplus by an individual who resold her to a corporation then controlled by appellant Breskovich. The corporation then sold the vessel to appellants, or their predecessors in interest.

The Pacific Queen became a total constructive loss on September 17, 1957 because of a violent explosion. Immediately thereafter, in the regular course of its official duties, the Coast Guard made a full investigation. The transcript of the Coast Guard's hearing, its detailed findings and conclusions, recommendations and official action, were offered into evidence by appellants and admitted *without objection*. The district court found the Coast Guard's findings and conclusions to be true and incorporated them by

---

1. Hereinafter the term "appellants" will be used to describe all plaintiffs below and (and appellants here) unless some special interest or issue requires a specific name to be used. Appellees (all un- derwriters of marine insurance for the Pacific Queen, defendants below) will be referred to as "appellees" unless a more specific designation is required.

reference and adopted them into its own findings of fact.

Beginning in 1950, appellants operated the Pacific Queen between Puget Sound and Bristol Bay, Alaska, as a refrigerated vessel to freeze and transport catches of salmon from Alaska to ports on Puget Sound. In 1951 regulations which prior thereto had prohibited power-driven fishing boats in Bristol Bay, as a fish conservation measure, were relaxed and power boats (e. g., gillnetters) up to thirty-two feet in length were permitted. Many of the gillnetters are powered by gasoline; others are powered by diesel fuel. Both types of fuel may be obtained from various sources in Alaska.

During the years beginning 1950, appellants insured the vessel with various insurance companies, including some but not all of the respective appellees which insured her in 1954.

On various occasions between 1950 and 1957, before each year's fishing season began, appellants, through a broker,[2] requested that the vessel be surveyed by the Board of Marine Underwriters of San Francisco, or by United States Salvage Association. On other occasions during this period appellants requested through a broker, other well recognized and competent surveyors to survey the vessel. This was done in 1950 by Alexander Gow, Inc., and in 1953 by Captain Adrian Raynaud, but neither surveyor reported the existence of any gasoline or gasoline tank capacity aboard the Pacific Queen.[3]

On or about May 3, 1955, Hansen & Rowland, acting as broker for appellants, requested United States Salvage Association to make a condition survey of the Pacific Queen. One Edward Marquat, an experienced surveyor, since deceased, was assigned to the task. He made an exceptionally careful and meticulous survey. His condition report (six single-spaced pages) is dated May 13, 1955. With respect to gasoline, his report read in full text:

"Fuel and Water Capacities:
Fuel 49,000 gallons
Water 14,000 "
Gas 3,000 "
(Gasoline tanks under deck aft, proper filling lines and vents to atmosphere)."

The court found Pacific Queen Fisheries knew Marquat's report was the only information appellees had concerning gasoline "because, in 1956, appellant John Vilicich, one of the active partners [experienced in the marine insurance business] asked for and received a copy of the report."

The Pacific Queen did not engage in Alaskan operations in 1956. She remained in lay-up status. On about May 2, 1957, Hansen & Rowland, again acting as appellants' broker, requested United States Salvage Association to make a condition survey. Appellants particularly requested a survey of two newly purchased gillnetters and, incidentally, of the Pacific Queen. J. E. Elkins, an experienced surveyor, made the survey. Elkins' only other survey of this vessel was made in 1949—at which time no gasoline was being carried by the vessel. His report (Exs. 359, 360), dated May 2, 1957, like those of Gow's (in 1950) and Raynaud's (in 1953), made no reference to gasoline tank capacity, nor to any bulk gasoline carried aboard the vessel. Elkins reported the vessel to be a mothership for gas-powered gillnetters. (Finding of Fact VIII. J., R. 258–259.)[4]

2. Appellants selected, from time to time, different brokers. See Finding of Fact VIII. D., R. 256.

3. In 1949, pursuant to Coast Guard orders when the vessel was chartered to carry cargo to Hawaii, the Navy's aqua system for transporting and dispensing gasoline from the vessel's two aft gasoline tanks was blanked off and disconnected, and the two tanks were filled with water.

4. Until 1951, the small "gill net" fishing boats used in Bristol Bay, Alaska fishing were powered by sail and oars. In 1951, power boats up to thirty-two feet in length were permitted to fish there under regulations of the United States Fish and Wildlife Service. Gasoline for use on

At the time of the explosion on September 17, 1957, the gasoline tank capacity of the Pacific Queen had been increased from 3,000 to 8,000 gallons. This increased gasoline tank capacity was accomplished by filling two tanks, theretofore used for diesel fuel, with 5,000 gallons of gasoline. Gasoline is a far more hazardous commodity than diesel oil to use or transport. Appellants inserted below-deck exposed gasoline-discharge valves into fittings that had been designed and used for insertion of permanently secured drainage plugs. These valve replacements were located in or near a passageway where ship's equipment, fishing gear and personnel frequently passed.

These alterations for discharging gasoline adapted by the Pacific Queen were apparently unique to her. Such a system or method of handling and discharging gasoline was not in common usage. It was not used on other vessels in which some of the Pacific Queen's owners had, and have, an interest. There was no positive evidence the same method had ever been used on other vessels.

The appellants accomplished this change in the vessel's gasoline tank capacity (i. e., the increase of gasoline tank capacity from 3,000 to 8,000 gallons by means of the above described alterations) at some date subsequent to the May 13, 1955 Marquat condition survey, and prior to the attachment of insurance on May 24, 1957.

On May 27, 1957, the Pacific Queen departed from Seattle and proceeded to Alaskan water to engage in fishing. She commenced her adventure with the increased gasoline tank capacity and the changed method of piping, valving and internal method of discharge of gasoline described above known to her owners and manager.

After the Pacific Queen returned from Alaska, she shifted to various Puget Sound docks, and with her increased gasoline tank capacity and changed method of piping, valving and internal method of discharge of gasoline as hereinabove described, and with the knowledge of her owners and manager, she then was sent from Seattle to Friday Harbor.

While the Pacific Queen was at Friday Harbor, she had on board approximately 2,000 gallons of gasoline. On September 9, 1957, while at Friday Harbor, 500 to 600 gallons of gasoline were spilled from one of the vessel's tanks in its hold into the interior of the vessel. While appellants minimized the seriousness of this spillage, the court below believed it was a serious incident. It created great hazards to the ship, life and property. Gasoline from the spillage soaked and impregnated large parts of the wooden hull and structure of the vessel. It was not a sudden spill. It began early in the evening preceding its discovery at 4:00 a. m. by the cook. It lasted at least six hours, probably longer. In the course of the spillage, liquid gasoline and gasoline fumes permeated the lower after portion of the vessel.

The spillage was reported to one of the appellant-owners and manager of the vessel (appellant Mardesich) while he was in Friday Harbor on September 9, 1957. He inspected the vessel but gave no specific orders as to the methods to be used in cleaning her. He did not order any chemical tests to be made to determine if she was gas-free; he did not order the plugging-up of the valves on the other gasoline tanks to prevent similar spills. Nor did he order the discharge of the remaining gasoline from the other tanks.

In an attempt to purge the vessel of gasoline, cold water, sprayed through a hose, was used to wash down the area. After removal of all visible traces of gasoline, the area was again washed down with cold water, and a bilge cleaning solvent was used in an attempt to remove the gasoline from the wooden hull. Portable blowers were used to remove gasoline fumes from the vessel. Then, on the evening of September 10, 1957, the ves-

such boats is obtainable in Alaska from various sources, "including tank vessels, scows, barges and shore facilities." (Finding VIII B, R. p. 255.)

sel's ventilation blowers were placed into operation to free the vessel from gasoline fumes.

The district court—basing its findings on expert testimony—found the steps taken to purge the vessel of gasoline and gasoline fumes to be inadequate. After the Friday Harbor spill and with the knowledge of the vessel's owners and manager, a plug was put into the valve on *one* of the tanks but no precautions were taken to prevent similar spills from the remaining three tanks. The court found: "All of the plaintiffs' [appellants'] witnesses, including two of the part-owners, who were experienced in the handling of gasoline, agreed that this was a serious want of due diligence." All of appellees' witnesses agreed that it was extraordinarily hazardous to permit a vessel to be in such condition, or to send the vessel to sea in such a condition, and that it might take a period of weeks before the vessel was sufficiently gas-free to operate with safety.

On the evening of September 11, 1957, the Pacific Queen departed from Friday Harbor and proceeded to Seattle. On September 15, 1957, she left Seattle and proceeded to Tacoma where she tied up at "Old Town Dock" at approximately 4:35 P.M.

At approximately 4:00 A.M. on the morning of September 17, 1957, a violent explosion occurred on board the Pacific Queen. Portions of the vessel were hurled several hundred yards away, plate glass windows in the surrounding area were broken, and a distinct jar from the explosion was felt some two miles distant. Witnesses living a few hundred feet from the explosion, who were immediately awakened and could observe it, reported a ball of orange fire and a black smoke present at the time of the explosion— color characteristics consistent only with an explosion of gasoline vapor origin.

The explosion ripped open the vessel's hull planking on the port after side of the engineroom at the turn of the bilge and a large section of the vessel's main deck aft of the superstructure (together with brine tanks, hatches, manhole covers, a gillnet boat, etc.) was blown off, and into the water. A fire *followed*, and the Pacific Queen ultimately settled on the bottom with a ten degree list to the starboard. The source of the explosion's ignition is unknown. It could have been a spark from a cigarette, or a match, or an electric contact, or other accidental source. But, by an "overwhelming preponderance of the evidence," the district court found the constructive total loss of the Pacific Queen was the result of a gasoline explosion.

The district court, sitting without a jury, held appellees free from liability on contracts for insurance against loss on the Pacific Queen—in the total amount of $325,000—which each of the appellees, in varying amounts, had underwritten. From a judgment so holding, appellants take this appeal.

Appellants' opening brief does not specify wherein the findings of fact and conclusions of law are alleged to be erroneous.[5] After having this discrepancy pointed up by appellees in their answering brief, appellants set forth their forty-eight specifications of error in the appendix to their reply brief. Of these, Numbers 1, 3, 14 and 47 have been waived or abandoned.

The principal questions here presented by the forty-four errors specified are whether the district court was clearly erroneous in finding:

1. That appellants concealed from appellees circumstances material to the risk.

2. That the Pacific Queen was, with the privity of appellants, sent to sea in an unseaworthy condition.

3. That the loss and damage to the Pacific Queen resulted from a want of due diligence by the vessel's appellant-owners.

5. As is required by Rule 18(2) (d) of this court, 28 U.S.C., and which this court has repeatedly held must be observed.

E.g., Thys Co. v. Anglo California National Bank, 1955, 9 Cir., 219 F.2d 131.

4. That appellants breached their implied warranty that the Pacific Queen's adventure was a lawful one and that, so far as appellants were able to control the matter, the adventure was to be carried out in a lawful manner.

Collateral questions presented are whether the district court was clearly erroneous in holding:

5. That a contractual time bar raised by one appellee was an effective bar to appellants' action.

6. That certain appellants were partners in the Pacific Queen Fisheries.

7. That appellants had not perfected their right to jury trial.

 Several preliminary observations should be made. First, in accordance with the intent of the parties as set forth in the certificate of insurance covering the hull,[6] as stipulated by both parties on brief, and as found and held by the district court,[7] English Law and usage governs the substantive law of the instant case. Secondly, it is not incumbent upon *appellees* to persuade this court that the district court's findings of fact are correct; on the contrary, the *appellants* must persuade this court that the

district court's findings of fact are, as specified by appellants, clearly erroneous.[8] Third, this court must view the evidence in the light most favorable to the party who prevailed below; such a party must be given the benefit of all inferences that may reasonably be drawn from the evidence. The findings of the trial court sitting without a·jury must be accepted unless they are clearly erroneous; they cannot be upset if they are supported by substantial evidence.[9]

## I

## DID APPELLANTS CONCEAL CIRCUMSTANCES MATERIAL TO THE RISK?

██ ██ Was the district court clearly erroneous in finding—and holding accordingly—that the insurance was void *ab initio* because appellants failed to disclose material increases in the risk caused by the increased gasoline carrying capacity of the Pacific Queen and the extra-hazardous methods of carriage of that increased amount of gasoline? We hold it was not.

The district court made careful and voluminous findings.[10]

6. Which reads:
 "(c) Warranted to be subject to English Law and usage as to liability for and settlement of any and all claims."

7. R. 224–226, 279–280.

8. Appellants' misconception is implied in the following language at page 5 of their reply brief:
 "[Appellees], instead of endeavoring to persuade this Court that *Pacific Queen's* explosion was fueled by gasoline, have merely adopted the Findings of Fact of the District Court on this and all factual questions in the case. * * * Apparently they are under the mistaken impression that Fed.R.Civ.P. No. 52(a) [28 U.S.C.] will pull the laboring oar for them. * * *"

9. Sherman v. Lawless, 8 Cir. 1962, 298 F.2d 899. See also, Hudson v. Wylie, 9 Cir. 1957, 242 F.2d 435, cert. den. 355· U.S. 828, 78 S.Ct. 39, 2 L.Ed.2d 41; Lewis Food Co. of Cal. v. Milwaukee Insurance Co., 9 Cir. 1958, 257 F.2d 525; Stacher v. United States, 9 Cir. 1958, 258

F.2d 112, cert. den. 358 U.S. 907, 79 S. Ct. 232, 3 L.Ed.2d 228.

10. "IX.
 "Plaintiffs' Changes in Bulk Gasoline Conditions Aboard the Pacific Queen were Material Increases in the Risk
 "A. At the time of the explosion on September 17, 1957, the gasoline tank capacity had been increased from 3,000 to 8,000 gallons. Plaintiffs now contend that, sometime *before* the Marquat survey of May, 1955, the gasoline tank capacity of the Pacific Queen was increased to 8,000 gallons by filling 2 tanks, theretofore used for diesel fuel, with 5,000 gallons of gasoline; and that certain hazardous alterations, for discharging this gasoline as described below, had already been accomplished.
 "B. But any evidence of this is incredible. As recently as June, 1960, at a pre-trial deposition, plaintiffs' counsel stipulated that any such alterations in gas tank facilities were made some time *after* the end of the 1955 season and before the beginning of the 1957 season. * * * The 1957 season *did not be-*

gin until May 24, 1957, when 8,000 gallons of gasoline were loaded aboard the Pacific Queen before she sailed to Alaska. In other respects plaintiffs' evidence on this matter was conflicting and obscure. It is impossible to fix the exact date of these changes because the owners failed to come forward with any information until very late, and the information then offered was exceedingly vague and unsatisfactory.

"C. Based upon all of the evidence, the Court finds that, at some date subsequent to the 1955 survey, and prior to the attachment date of the insurances on May 24, 1957, the plaintiff owners and managers of the vessel had increased the gasoline-carrying capacity of the Pacific Queen from approximately 3,000 gallons to 8,000 gallons. This alone was a material increase in the risk which was not disclosed to the Underwriters.

"D. An even greater undisclosed increase in the risk was accomplished at that time by making the following extremely hazardous alterations in the method of discharging gasoline. Plaintiffs inserted interior below-deck exposed gasoline-discharge valves into fittings that had been designed and used for insertion of permanently secured drainage plugs. These valve replacements were located in or near a passageway where ship's equipment, fishing gear and personnel passed.

"D. [sic] The increase in the risk in both particulars is an obvious fact that should have been known to anyone with a minimum of experience or understanding. It was certainly known to the owners of the Pacific Queen, and was virtually admitted by them. The installation of interior below-deck discharge of gasoline through the type of facilities that were provided on the Pacific Queen is so patently an increase in hazard as hardly to require expert testimony. It is impossible to defend as safe or proper such a system of discharge with hand valves located on or near a passageway where ship's equipment, fishing gear and personnel frequently pass back and forth.

"E. This altered method adapted by the Pacific Queen for the handling of gasoline was not in common usage, but was exclusive to the Pacific Queen. It was not even on other vessels in which some of the owners of the Pacific Queen had, and have, an interest. * * *

"X.

"Plaintiffs failed to Disclose these Material Increases in the Risk to Hansen & Rowland or to Defendants

"A. Plaintiff August Mardesich was the Manager of the Pacific Queen in 1957. He was not quartered or employed aboard the vessel in any capacity. He had personal knowledge of the gasoline tank and discharge changes which rendered the vessel extremely hazardous and which materially increased the risk. Neither he nor any of the other partners disclosed these changed conditions to the Underwriters.

"B. The increased gasoline capacity and the hazardous modifications of the discharge system were not made at a time or under circumstances such as to bring them to either the actual or the constructive notice of the Underwriters.

"C. The owners and managers of the Pacific Queen knew of these changes and did not disclose the increased gasoline capacity, or the altered and hazardous gasoline-discharge methods, to the defendant underwriters or to Hansen & Rowland, who were brokers for the owners, or to the surveyors.

"D. Neither Marquat, now deceased, who made an insurance survey in 1955, nor Elkins, since retired, who made the survey in 1957, knew of the increased gasoline capacity of the unsafe and improper gasoline-discharge facilities at the time of their respective surveys, and there was nothing observable by any reasonable inspection which would have disclosed the changes.

"E. At the time of the surveys by Marquat and Elkins there was nothing in the situation that was observable, by reasonable inspection, which would have disclosed that the owners and managers had made or intended to make the changes in gasoline capacity or discharge facilities which existed at the time of the loss of the Pacific Queen. Plaintiffs' counsel now claims, on brief, that, whenever these changes were made, they were 'a simple job that would not take two men 30 minutes.' * * *

"F. Both of the surveyors are described by everyone who has spoken to them as having been marine surveyors of the highest ability, character and integrity, who would not have overlooked or disregarded anything of the magnitude of the increase in the risk here described if it had been actually conveyed to them. Marquat was particularly meticulous in the survey work that he did. It is inconceivable, and there is no credible evidence to the contrary, that he had, either by any oral statement made to him or by anything that could or should have been seen in making his survey, any knowledge which would have disclosed either the increased gasoline capacity or the change

The Marine Insurance Act, 1906,[11] in part here pertinent, provides:

"17. A contract of marine insurance is a contract based upon the utmost good faith, and, if the utmost good faith be not observed by either party, the contract may be avoided by the other party.

\* \* \* \* \* \*

"18.—(1) \* \* \* the assured must disclose to the insurer, before the contract is concluded, every material circumstance which is known to the assured, and the assured is deemed to know every circumstance which, in the ordinary course of business, ought to be known by him. If the assured fails to make such disclosure, the insurer may avoid the contract.

"(2) Every circumstance is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk."

Appellants contend that they were not under a duty to disclose the increased gasoline tank capacity of their vessel, or the below-deck alterations made to dispense gasoline because (a) appellees must be presumed to have had notice of the changes, even though they might not have had actual notice, and (b) appellees waived disclosure of the changes.

Section 18(3) of the Marine Insurance Act, 1906, provides the following exceptions to the duty to disclose:

"In the absence of inquiry the following circumstances need not be disclosed, namely:

\* \* \* \* \* \*

"(b) Any circumstance which is known or presumed to be known to the insurer. The insurer is presumed to know matters of common notoriety or knowledge, and matters which an insurer in the ordinary course of his business, as such, ought to know;

"(c) Any circumstances as to which information is waived by the insurer. \* \* \* "

These exceptions to the duty of disclosure are discussed in 2 Arnould on Marine

in discharge facilities that existed at the time of the loss.

"G. At the time of the 1957 survey Elkins was asked primarily to survey the new gillnetters, and incidentally 'to take a quick look at the Queen.' No representative of plaintiffs identified himself when Elkins surveyed the Pacific Queen, though Jasprica was present and failed to do so.

"H. Had either of the surveyors, Marquat or Elkins, actually known of the increased gasoline capacity or of the unsafe and improper gasoline-discharge facilities at the time of their respective surveys, they would not only have reported the same in their surveys but would have required correction of the facilities prior to the issuance of insurance.

"I. This loading of gasoline on board and the altered discharge methods were done with the knowledge of plaintiffs' manager and owner, August Mardesich, and of the other partners, including Mr. Barovic, Mr. Breskovich and Mr. Jasprica. The latter occupied several roles as part-owner, chief-engineer and fishing-superintendent.

"J. Each of the changes constituted a material increase in the risk which was concealed from and not disclosed to defendants.

"K. The material increases in the risk arose when the altered gasoline-discharge facilities were installed and gasoline-carrying capacity more than doubled, and such greatly increased quantities loaded on board under such hazardous conditions. At that time, the owners either knew or, in the exercise of the most minimal standards of prudence and care, should have known of the increase in risk by reason both of the increase in carrying capacity of gasoline and, even more emphatically, by reason of the changed gasoline discharge methods to an extremely hazardous below-deck system.

"L. Defendants would not have insured the vessel if plaintiffs or their brokers had disclosed to them any or all of these material increases in the risks."

11. 6 Edw. 7, C. 41. This Act is referred to in appellees' brief as appearing in 2 Arnould, Marine Insurance (1954) 1186 ff. Arnould's 15th Edition (1961) takes the new title of "British Shipping Laws—Vols. 9 & 10." The Marine Insurance Act, 1906, appears at 1261 ff.

Insurance, 15th Ed. (1961), §§ 621–631. After quoting the stilted language of Lord Mansfield in Carter v. Boehm, (1766) 3 Burr 1905, it is there said, on the question of what is presumed to be known to the insurer, that:

"[A]n insurer is presumed to know that it is impossible to make a floating dry-dock as seaworthy as an ordinary ocean-going craft, and is put on inquiry, if he admits seaworthiness as to the means adopted to strengthen it.

"A knowledge of the political state of the world, of the allegiance of particular countries, of their standing mercantile regulations, of the risk and embarrassment affecting the course of trade contemplated by the insurance, must all necessarily be imputed to the Underwriter, and therefore, need not be disclosed by the assured. * * *" (Arnould, supra, § 622.)

And, on the question of what ought to be known to an insurer, Arnould states:

"On the principle that the assured need not disclose what the Underwriter ought to know, it has been decided in several cases that facts comprised in the general usages of the trade need not be communicated to the Underwriter; * * * But to dispense with communication of anything done according to usage, *such usage must be generally and universally known to all engaged in the trade.*" (Arnould, supra, § 623.) (Emphasis added.) Citing Tennant v. Henderson, (1813) 1 Dow 324.

The Marine Insurance Act, 1906, Section 18 provides with respect to disclosure:

" * * * (4) Whether any particular circumstance, which is not disclosed, be material or not is, in each case, a question of fact."

The district court here found as a fact (a fact appellants seemingly do not controvert) that the altered method of handling gasoline was not a usage "generally and universally known to all engaged in the trade," but, on the contrary, found that it was unique—it was "not in common usage, but was exclusive to the Pacific Queen." Elkins, when making his 1957 survey, had only known the Pacific Queen as a vessel not carrying gasoline. Elkins reported her to be a mothership for gas-operated gillnetters. But, as the district court found, this gave no notice that the Pacific Queen was carrying bulk gasoline, because gasoline and other types of fuel were, and are, available from various sources in Alaska other than the mothership. Appellants' reliance on the exception to require disclosure based upon usage is misplaced.

As to the exception to the duty of disclosure based on waiver, Arnould states:

"It was * * * held by the Court of Appeals [in Mann, MacNeal & Steeves v. Capital & Counties Ins. Co.] that information that the cargo was of a hazardous character had been waived. Bankes L.J. said that an Underwriter waives any information in relation to what may be fairly described as a parcel or ordinary cargo of lawful merchandise, and also, quoting Lord Esher M.R. in Asfar v. Blundell that the rule *is satisfied if the assured discloses sufficient to call the attention of the Underwriters so that they can see if they require further information, they ought to ask for it. * * *"* (Arnould, supra, § 631.) (Emphasis added.)

And further:

"Atkins, L.J. with whose judgment on this point Younger, L.J. agreed, said that included in the risk an Underwriter takes is the risk that there is an already concluded engagement for hazardous cargo, just as there is the countervailing possibility he runs no risk of a hazardous cargo at all, by reason of an absolutely safe cargo having been agreed." (Id.)

■ Appellants place great reliance upon Mann, MacNeal & Steeves v. Capital & Counties Ins. Co. (1921) 2 KB 300—

the case cited and discussed by Arnould in § 631, supra. In Mann no absolute rule as to disclosure was established. The disclosure of the nature of the cargo (even when it is iron drums of gasoline, as it was there) is waived where there is proof the cargo "is an ordinary and common form of merchandise" (p. 306) which can be carried as safely as the common run of cargo. "The question whether disclosure must be made or not is one of degree, depending upon the circumstances of each particular case." (p. 307.) But appellants do not explain the above italicized language in the quotation from Arnould, supra, § 631. Further the failure to disclose here relates to a *part of the ship*—the altered method of handling gasoline; not to the *cargo* itself.

█ Appellants next contend that appellees waived disclosure of the increased gasoline tank capacity and the altered methods of gasoline discharge because surveys had been made. But the district court found that appellants did not disclose the altered method of handling gasoline to the surveyors; that the surveyors did not know of these alterations; that the altered methods were exclusive to the Pacific Queen; that they were not common usage; and that to make such alterations was a simple job that would take two men thirty minutes to perform. Further, the district court found that the alterations were not observable by reasonable inspection.

Appellants were under a duty to advise the surveyors of alterations requiring especial examination. This court has previously so held. In States Steamship Company v. United States, 1958, 9 Cir., 259 F.2d 458 at 469, we said:

"Marine Surveyor Wilson who then inspected the ship for the American Bureau of Shipping testified that he received no special information concerning the vessel prior to his survey and he knew nothing outstanding against it. The record warranted the court's evident

conclusion that an inspection of a vessel known to have a history of crack sensitiveness and particularly a history of a Class 1 fracture, should be much more careful and elaborate than this vessel ever had. The company itself was chargeable with knowledge of the pending inspection and yet it failed through Vallet or Brenneke [its port engineer, and its manager, respectively] or any other person to inform the inspectors of these special conditions attending the ship. In the words used in The Silver Palm [9 Cir., 94 F.2d 776], all these circumstances 'made the more imperative the obligation of the owner and operator to advise' of the special circumstances calling for a special inspection and a more thorough one than had been given." [12]

That appellants were here under a duty to disclose is also shown in the holding of the British case of The Assunzione, (1956) 2 Lloyds List Law Rep. 468, where, at 486, Mr. Justice Willmer (in quoting the expert Rolland and in discussing the value of a survey made by the owners themselves, and not one made by a classification surveyor) said:

"A prudent shipowner has a superintendent whose duty it is in the first instance to go around the vessel finding out the defects, and pointing them out to the Classification Surveyor. A superintendent does not rely on the Classification Surveyor to point out the defects—at least it is not good practice to do so. The superintendent and the Classification Surveyor should inspect together and deliberate on what should be done."

█ Appellants contend, in their reply brief, that the changes made on the Pacific Queen must have, or should have, been apparent to Elkins. We cannot agree. As mentioned above, because the vessel was engaged in Bristol Bay operations did not mean it *had* to be carrying

---

12. And see cases we cited in that decision: The Silver Palm, 9 Cir., 94 F.2d 776; Spencer Kellogg & Sons v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903.

gasoline. And appellants' gesture of requesting a survey on an unlighted dead vessel, which survey was related to a request to look at two new gillnetters, and only incidentally, to "look over" the vessel; plus (a) appellants' failure to point out hazards or (b) advise Elkins of intended changes, and (c) their failure to have one of the owners who was chief engineer identify himself, and (d) the failure to inform their brokers of present or intended changes, do not meet the good faith and fair disclosure requirements of the Marine Insurance Act. Nor can it lead us to believe that the district court was clearly erroneous in finding that the changes were *not* necessarily apparent to Elkins.

Appellants further contend, in their reply brief, that the quantity of gasoline carried was immaterial from a risk standpoint because only two gallons of gasoline (according to appellees' expert) was all that was needed to fuel an explosion of the magnitude of that which destroyed the Pacific Queen. The quantity carried may or may not be material; the manner in which the gasoline was carried and handled is material. If only two gallons of gasoline were needed to do that which was done, then an extra-hazardous system such as was here adopted by appellants makes the change all the more material; and indicates the correctness and reasonableness of the district court's finding that appellees would not have insured the vessel if appellants or their brokers (who were also kept in the dark) had disclosed all or any of the several material increases in the risk.

Appellants also contend many of the cases cited by appellees on this issue are inapposite. But they still rely on the Mann case, supra, and make no reply to Arnould's commentaries, nor to the language of the Marine Insurance Act itself.

Viewing the evidence as this court must, we agree with the district court's holding that the insurance never attached and was void *ab initio* for failure to disclose material increases in the risk. Such a holding was not clearly erroneous; nor was it without substantial evidence in the record to support it.

## II

## WAS THE PACIFIC QUEEN, WITH THE PRIVITY OF APPELLANTS, SENT TO SEA IN AN UNSEAWORTHY CONDITION?

■ The next question is whether the district court's finding that the Pacific Queen, with the privity of appellant-owners, was sent to sea in an unseaworthy condition is clear error. Again, we cannot hold the district court's finding was clearly erroneous.[13]

13. The district court found: "XI.

"The Pacific Queen was repeatedly sent to Sea in an Unseaworthy State with the Privity of the Owners

"A. The Pacific Queen was unseaworthy each time she was sent to sea on and after May 24, 1957. The Pacific Queen was unseaworthy when she left for her 1957 voyage by reason of the hazardous condition caused by the increased gasoline-carrying capacity and, to an even greater extent, by reason of the changed method of piping, valving and internal methods of discharge of gasoline. This system was grossly unsafe and improper, and created a great and serious hazard to life and property. The owners were privy to this unseaworthiness, and knew of these conditions and neglected to take reasonable precaution to correct these deficiencies and to make her seaworthy.

"B. After the Pacific Queen returned from Alaska, she shifted to various Puget Sound docks and was then sent to sea from Seattle to Friday Harbor, Washington. The hazardous gasoline condition remained uncorrected, and she was still in an unseaworthy state with privity and knowledge of her owners, and of her manager.

\*　　\*　　\*　　\*　　\*

"D. It is interesting to note that the Friday Harbor spill was first discovered at 4 o'clock in the morning by the cook who was sleeping in his quarters on the main deck to which the fumes were wafted while the vessel was in a dead state with its ventilation not operating. It is probably more than coincidental that 8 days later, in Tacoma, at exactly the same time under almost identical conditions, the next time the ship's ventilation was shut down, the explo-

Appellants do not strenuously contend that the Pacific Queen was not unseaworthy. Rather, the crux of their argument under this heading, premised upon Section 39(5) of the Marine Insurance Act, 1906, is that unseaworthiness is immaterial. The Act referred to reads:

"In a time policy there is no implied warranty that the ship will be seaworthy at any stage of the adventure. * * *"

And, as appellant brought this action under a time policy, they contend that the above wording removes any implied warranty of seaworthiness unless appellees can bring themselves within the following exception found in Section 39(5) which reads:

" * * * but, where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributed to unseaworthiness."

Thus appellants' argument here is that the Pacific Queen, even though unseaworthy, *was not sent to sea with their* *privity*. Appellants challenge both the terms "sent to sea" and "privity." It seems, however, that even here appellants' attack is directed toward the district court's interpretation and applicability of such terms *after* the Friday Harbor spillage. This is shown by appellants' extensive discussion on whether or not moving from port to port on Puget Sound is "at sea." [14]

But the district court found "her continuous unseaworthiness was a proximate cause of her loss." She "was unseaworthy each time she was sent to sea on and after May 24, 1957." We agree with these findings, and need not decide the non-controlling issue of whether the Pacific Queen was "at sea" after the Friday Harbor spillage.

As Arnould, supra, states at § 706: [15]

"It is not necessary, [under § 39 (5) of the Marine Insurance Act, 1906] in order to exonerate the insurer from liability, that the unseaworthiness should be the sole cause of the loss; it is sufficient that the explosion was a proximate cause of her loss."

---

sion took place in an area between the place of the spill and the location of the crew's quarters.

"E. The vessel was sent to sea with the privity of the owners and managers in an unseaworthy condition from Friday Harbor to Seattle where she remained a few days exposed to the same hazards and tied up at an oil dock where great hazard to life and property was continuously threatened. She then was again sent to sea from Seattle to Tacoma under the same extremely hazardous conditions.

"F. By reason of the continuing hazardous and unsafe method of discharging gasoline and by reason of the failure properly to clean up after the Friday Harbor spill, the Pacific Queen was again sent to sea in an unseaworthy condition when she left Seattle for Tacoma two days prior to her explosion and loss.

"G. The day after her arrival at Tacoma, while still in such perilous and unseaworthy condition with the privity and knowledge of her assured owners and managers, she exploded and became a constructive total loss with loss of life, and destruction of property. Her continuous unseaworthiness until her fatal

14. Appellants urge that "sent to sea" be defined by "Pilot Rules for Inland Waters," 33 CFR Part 80. But it should be noted that the trip from Seattle to Friday Harbor took seven hours; the vessel could make up to twelve knots; and the waters of Puget Sound can be rough enough to founder a great vessel (The President Madison, 9 Cir. 1937, 91 F.2d 835). Appellants concede that to make the case of The West Kebar (American-West African Line, Inc. v. Socony-Vacuum Corporation, D.C.E.D. N.Y., 1933, 4 F.Supp. 515) applicable, a further step must be taken. There the movement from one berth to another in the same harbor was held not the commencement of the voyage. Seventy miles of what can be rough water and a course which will allow a vessel to make twelve knots seems factually different from the Kebar case.

15. Citing: M. Thomas & Sons Shipping Co. v. The London & Provincial Mar. Ins. Co., (1914) 29 T.L.R. 736 (cf. p. 737); Cohen v. Standard Mar. Ins. Co. (The Prince George), (1925) 30 Com. Cas. 139 (cf. pp. 157–163, inclusive).

unseaworthiness was a proximate cause of the loss."

As to "privity," we again find the district court correct in finding it existed. Appellants place their principal reliance upon Cia. Naviera Vascongada v. British & Foreign Marine Insurance Co., Ltd., (1936), 54 Ll.L.Rep. 35. Because the district court did not cite this case in its determination of the privity question, they claim a separate error. (Specification of Error 24.)

Appellants, on the authority of the Vascongada case, contend that there was no privity unless appellant Mardesich deliberately omitted or refrained from an examination of the vessel which might have revealed that gasoline had soaked and impregnated large portions of her wooden area, and that the omission of appellant Mardesich to take more precaution than was in fact taken cannot make appellants privity to any unseaworthiness which resulted from the gasoline spillage on September 9, 1957. But this contention again relates only to events which occurred *after* the Friday Harbor gasoline spillage. And the district court found that the vessel's unseaworthiness was continuous from and after May 24, 1957, the day insurance attached.

The correct and most concise statement of what is meant by "privity" is set forth in M. Thomas & Son Shipping Co. v. The London & Provincial Mar. Ins. Co., (1914) 30 T.L.R. 595 (C.A.). There, at page 596, the court said:

"[W]ords in s. 39, sub-s 5, of the Marine Insurance Act, 1906, 'Where with the privity of the assured a ship is sent to sea in an unseaworthy state,' meant where the owner was privy to the state of things which in fact rendered the ship unseaworthy."

A reading of the facts as found by the district court clearly indicates that, within this definition, each time the Pacific Queen was sent to sea from and after May 24, 1957, until her loss, she was in an unseaworthy state, to the knowledge and with the privity of the assured owner. This because of the knowledge of its condition resting in one or more of the partners, and the manager (also a partner). The facts substantiate the district court's finding that said unseaworthiness was a proximate cause of the vessel's loss.

## III

## DID THE LOSS AND DAMAGE TO THE PACIFIC QUEEN RESULT FROM WANT OF DUE DILIGENCE BY APPELLANTS?

Appellants contend the district court erred in holding that they were precluded from recovering the loss of the Pacific Queen under the broader coverage of the Inchmaree clause contained in the contract of insurance here in issue.

Appellants represent that the Inchmaree clause was introduced to extend or broaden coverage and liability of underwriters; that the Inchmaree clause broadens coverage to include a variety of risks not embraced in the general perils of the sea clause. Appellees do not quarrel with this opinion.[16]

The Inchmaree clause reads:

"This insurance also specially to cover (subject to the free of average warranty) loss of or damage to hull or machinery directly caused by the following:—

"Accidents in loading, discharging or handling cargo, or in bunkering or in taking in fuel.

"Explosions on shipboard or elsewhere.

"Bursting of boilers, breakage of shafts or any latent defect in the machinery or hull (excluding, however, the cost and ex-

16. An example of the broader coverage is shown in the instant case. The general perils clause does include "fire" but does not include "explosion." Arnould, supra, § 819, citing Thames & Mersey Mar. Ins. Co. v. Hamilton, [1887], 12 App.Cas. 484. But the Inchmaree clause, by its very terms, includes loss by "explosion." Hence, appellants urge coverage under the Inchmaree clause.

pense of repairing or renewing the defective part).

"Negligence of Master, Mariners, Engineers or Pilots. [P]rovided such loss or damage has not resulted from want of due diligence by the Owners of the Vessel, or any of them, or by the Managers.

"Masters, Mates, Engineers, Pilot or Crew not to be considered as part owners within the meaning of this clause should they hold shares in the vessel."

Appellants assume, *arguendo*, on this issue that they were negligent. But, they contend, the Inchmaree clause includes this risk and, therefore, appellees should be liable for the loss and damage to the Pacific Queen. The cases here cited by appellants largely relate to other circumstances and law; e. g., most deal with section 39(5) unseaworthiness questions.

■■■ On this issue the district court found the loss was caused by a gasoline explosion.[17]

Appellants contend that the district court's finding that the loss of the Pacific Queen was due to a gasoline explosion was clearly erroneous. With this contention we cannot agree. A logical inference

---

17.　　　　　　"XII.

"The Destruction of the Pacific Queen was Caused by a Gasoline Explosion

"A. Based on the overwhelming preponderance of the evidence, the constructive total loss of the Pacific Queen was the result of a gasoline explosion. There is no credible or reasonable direct evidence or inference from the evidence to the contrary. The explosion was of gasoline and gasoline vapors from the prior spill into the interior of the vessel at Friday Harbor. The fire which followed the destructive explosion was primarily of this gasoline and gasoline vapors feeding on the wooden members of the then shattered hulk of the Pacific Queen as she was sinking to the shallow bottom. But the explosion had already caused such extensive wreckage as to render her a constructive and total loss irrespective of the subsequent gasoline flames touched off by the explosion which engulfed the wrecked vessel and though intense were soon extinguished.

"B. There is no credible evidence of arson. The Tacoma Fire Department, the Tacoma Police Department, and the United States Coast Guard all made extensive investigations and none found any basis for such a conclusion. No further evidence whatsoever as to arson or other wrongful acts by third persons was adduced in the extensive pre-trial depositions, or at trial; and the Court finds there is no basis in fact for any such contentions. The explosion was due to accumulated gas vapors that created a most perilous condition, and to accidental ignition possibly by the deceased crew member or some other chance spark.

"C. There was no pre-existing fire in the Pacific Queen preceding the explosion. The gasoline explosion was the proximate cause of the constructive total loss of the vessel. The source of ignition is unknown. It could have been a spark from a cigarette, or a match, or an electric contact, or other accidental source; but the explosion resulted from a want of due diligence by the assured owners and manager to remedy the extremely hazardous condition wich existed from the time of the gasoline spill.

"D. The possibility that it was an ammonia explosion is, at the very best, not any more than remote and unlikely speculation. Captain Buckler's testimony to the effect that he now believes the explosion to have been of ammonia origin was arrived at shortly before trial in conference with plaintiff's counsel, and without his being in possession of any additional facts other than those on which, a few months earlier, he had based his prior written survey opinion that the cause of the explosion was unknown. Plaintiff's expert witness, Mr. Sax, based his opinion that the explosion was of ammonia origin on an inadequate examination of the vessel and on assumed facts which were not supported by the evidence.

"E. Testimony, introduced by the plaintiffs, of witnesses living within a few hundred feet of the explosion, who were immediately awakened and could observe its inception, reported a ball of orange fire and of black smoke at the time of the explosion of gasoline. Such a characteristic is consistent only with an explosion of gasoline vapor origin. Plaintiffs' expert, Mr. Sax, also concedes this fact. The ammonia odor at the scene of the castastrophe was from ammonia remnants in a refrigeration system that had previously been completely pumped down. The odor is very noxious

from the facts before the trial court clearly allows such a conclusion.[18]

The district court's findings of want of due diligence on the part of ap-

and can arise from small traces or quantities.

"F. Moreover, and more importantly, the theory of an ammonia explosion is based entirely upon the additional hypothesis that a severe fire existed in the engine room prior to the explosion. The Court's personal examination aboard the hulk of the Pacific Queen and the photographs in evidence show, beyond the slightest question, that no fire existed in the engine room prior to the time that the forward bulkhead in the engine room was blown off its flanges. This occurred at the time of the explosion. The char in the engine room and behind the flanges is easily explicable by the fury of the fire after the explosion. This is illustrated by the photographs taken by Mr. Kollar.

"G. The Court was much more favorably impressed by the testimony of defendants' witnesses, Professor Moulton, Mr. Kniseley and Captain Lees, not only by reason of their greater scientific qualifications and practical experience and ability in the areas as to which they testified, but also because they were much more adequately apprised of the true facts of the explosion and fire.

"H. The peculiar internal system of ventilation and the path of air on the Pacific Queen, unaided by mechanical ventilation, so graphically illustrated at the time of the Friday Harbor spill, resulted in the presence in the upper port forward engine room of an explosive mixture of gasoline vapors with air at the time of the explosion which mixture was the explosive agent and cause of the loss of the Pacific Queen.

"XIII.

"The Owners and Manager of the Pacific Queen Did Not Use Due Diligence to Prevent the Loss of the Pacific Queen by Explosion

"A. Some of the owners and the manager of the Pacific Queen, Mardesich, were privy to, and had thorough knowledge of the dangerous conditions aboard the Pacific Queen from the time 8,000 gallons of gasoline were loaded in May 1957, to the date of the explosion on September 17, 1957. The owners and the manager, Mardesich, failed to use due diligence and were grossly negligent in preventing the loss of the Pacific Queen by explosion in at least two respects:

"1. First, as outlined above, at some time between 1955 and May 24, 1957, they were privy to and knew they had converted the gasoline discharge facilities of the Pacific Queen in such fashion as they became totally improper and unsafe. This improper and unsafe system was a proximate cause of the explosion and resultant destruction of the vessel.

"2. Second, the owners and manager of the Pacific Queen were privy to the Friday Harbor spill and failed to use due diligence and were grossly negligent in the steps taken toward cleaning up the results of the Friday Harbor gasoline spill and to purge the vessel and its structures of gasoline and gasoline vapors, all with the actual knowledge and acquiescence and direction of owner and manager Mardesich, as well as of owner, superintendent and chief engineer Jasprica.

"B. The manager, Mr. Mardesich, was especially privy to all of these conditions. He knew of the alterations of the tanks; of the loading of 8,000 gallons of gasoline; of the extreme hazard of exposed interior valves; and of the serious gasoline spill at Friday Harbor; and he personally inspected the vessel at that time, but he failed to exercise due diligence to purge her of gasoline and fumes, or to remove the remaining bulk gasoline, or to make any gas-free tests, or to secure and plug the drain-valves in the other tanks. Considering the serious nature of the spill, the measures taken by the owners and manager to purge the Pacific Queen of gasoline and gasoline vapors were not adequate in the exercise of due diligence.

"C. The subsequent explosion and destruction of the Pacific Queen were proximately caused by these failures by the owner and manager to use due diligence. This failure to use due diligence was with the privity and knowledge of the owners, and of the manager, Mr. Mardesich. He was fully informed but treated the hazardous loading, stowage, and subsequent large spill of gasoline with such a casual indifference as to amount to gross negligence and an extraordinary want of due diligence."

18. We need only refer to the report in evidence, and the testimony of witnesses, that there was present at the moment of the explosion a large ball of orange fire, and of black smoke; characteristics consistent only with an explosion of gasoline vapor origin. And *not* consistent, as conceded by appellants' expert, with an explosion of ammonia origin. (Finding of Fact XII, supra.)

pellant-owners and of a gasoline explosion are neither clearly erroneous, nor without substantial evidence to support them, seems clear. As stated by Arnould, supra, at page 764 (cited by appellants in their reply brief):

> "It is clear that a loss may be proximately caused by more than one peril, that is by a combination of causes, and in this event the loss can be properly attributed to any one of such causes."

We believe, therefore, it was proper for the district court to attribute the Pacific Queen's loss to a gasoline explosion, even if another peril or combination of perils *could* have been a concurrent cause.

## IV

DID APPELLANTS BREACH THE IMPLIED WARRANTY THAT THE ADVENTURE WOULD BE LAWFUL AND, TO THE EXTENT THEY COULD CONTROL THE MATTER, THAT THE ADVENTURE WAS TO BE CARRIED OUT IN A LAWFUL MANNER?

The district court found appellants guilty of such a breach.[19]

The district court concluded (a) that the Tanker Act was applicable, (b) that the Pacific Queen's gasoline was supplied and used by others, and (c) that the gasoline transported by the Pacific Queen was

---

19. "XIV.

"Plaintiffs had Imputed Knowledge of the Tanker Act and of Coast Guard Regulations which made it Unlawful to Transport Bulk Gasoline without a Certificate

"A. In 1949 plaintiff John Breskovich, as one of the owners of the Pacific Queen, chartered her to sail to the Hawaiian Islands, carrying refrigerated cargo during the time of a maritime strike. Incident to such use, he was required to have the vessel inspected by Coast Guard inspection, which required the vessel to make certain changes before she sailed, including the following:

'2–2000 gal. gasoline tanks aft of compressor room to be *pumped dry of gasoline, lines disconnect[ed] & tanks filled with water & plugged.*' (Emphasis supplied [by the court].)

"B. Plaintiff John Breskovich had actual knowledge of the existence of the Tanker Act by reason of his compliance with the Coast Guard regulations thereunder in preparing the Pacific Queen for a cargo voyage to Hawaii in 1949.

"C. Plaintiff John Vilicich had actual knowledge of the Coast Guard's contention that the Tanker Act was applicable to the Pacific Queen and reefer fishing vessels by August 1957 because the Alaska Reefer, another vessel of which he was also a part-owner, was cited for a violation of the Tanker Act by the Coast Guard for transporting bulk gasoline without inspection and certification as to safety. He knew this at least three weeks before the Friday Harbor spill.

"D. Plaintiff August P. Mardesich is a graduate of the University of Washington Law School, * * * He also knew of

that claim of the Coast Guard prior to the time the Pacific Queen was sent to sea to Friday Harbor * * *.

"E. Each of the three managing owners of the Pacific Queen, in its earlier years, were men of wide business experience and standing in the community. Each knew of the Tanker Act.

"XV.

"The Pacific Queen was in Continuing Violation of the Tanker Act Through the Fishing Season of 1957

"A. In 1957 gasoline was carried as cargo. It was sold to some independent fishermen. It was one of the concessions given to other independent fishermen to get them to fish for the Pacific Queen. More than 4% of the 8,000 gallons of gasoline carried to Alaska was sold to independent fishermen Pearson and Vistad. This amount constituted more than 6% of the number of gallons of gasoline actually used in the 1957 fishing season by the Pacific Queen.

"B. Under the 1957 joint venture agreement between Pacific Queen Fisheries, Pacific Reefer Fisheries, and North Star Fisheries, only 8 of 20 gillnet boats carried aboard the Pacific Queen belonged to Pacific Queen Fisheries. Nine belonged to Pacific Reefer Fisheries, one to North Star Fisheries, and two were independents. Under the terms of the joint venture agreement, the Pacific Queen agreed to supply gasoline for all of these other gillnet boats except the independents to whom it sold gasoline. Thus, well over 50% of the gasoline carried aboard the Pacific Queen was intended for gillnet fishing vessels, other than those belonging to the Pacific Queen."

not "fuel or stores" but was "cargo." The district court further concluded that such violation of the Tanker Act constituted negligence or want of due care and diligence on the part of the vessel's owners (independent of other findings of negligence and want of due diligence) but that this violation was not of such a character as to render the entire venture or voyage an illegal one. The court concluded that the hauling of the gasoline in bulk for the use described above was not the primary purpose of the voyage but merely an incident thereof.

We find the district court's findings and conclusions are detailed and well reasoned, but even were we to assume they were erroneous on this issue alone and were we to hold that appellants had not violated the Tanker Act [20] because its application as to them was vague and uncertain, this would not require a reversal of the case. With this in mind, we state the following:

We feel there exists a question, under the circumstances here presented, whether or not the bulk gasoline carried by the Pacific Queen could come within the term "fuel or stores." More importantly, other fishing vessels, performing a similar role as that played by the Pacific Queen, are (or very shortly will be) engaged in fishing adventures. Some carry bulk gasoline for the same purposes as those of the Pacific Queen. Many are insured, either by appellees or other underwriters. If a loss occurred, this case would be an important and perhaps controlling precedent. The Commandant of the Coast Guard said:

"3. Since full compliance with either the regulations under the Tanker Act or the Dangerous Cargo Act, neither of which regulations were designed to cover this type of vessel and operation, which is presumably fishing, is impossible, or impracticable of accomplishment and further, since it is possible that the legal responsibilities of the owners of this type of vessel are not sufficiently clear, the file in this case will be referred to the Merchant Marine Council for study and action towards issuing such clarifying regulations as may be indicated."

Therefore, we prefer not to make an unnecessary decision on a non-controlling issue until the Merchant Marine Council (an expert body which can hold hearings and consider all ramifications of the question) has determined by regulation whether vessels of the Pacific Queen's type and operation should or should not be within the purview of the Tanker and Dangerous Cargo Acts.

## V

### COLLATERAL QUESTIONS.

A. Did the contractual limitation of action provision in the Buffalo Insurance Company policy bar appellants' action against Buffalo Insurance Company? We hold it did.

Conclusion of Law XI reads:

"The Liability of defendant, Buffalo Insurance Company, is in any event barred by the time of suit clause.

"The policy of defendant, Buffalo Insurance Company (Pl.Ex. 1) provides in part:

" 'No suit or action on this Policy for the recovery of any claim shall be sustainable in any Court * * * unless commenced within *twelve months* next after the calendar date of *the happening of the physical loss*

---

20. The Tanker Act (46 U.S.C.A. § 391a), in pertinent part, reads:

"All vessels, regardless of tonnage, size, or manner of propulsion, and whether self-propelled or not, and whether carrying freight or passengers for hire or not, that shall have on board any inflammable or combustible liquid cargo in bulk,

* * * shall be considered steam vessels for the purposes of title 52 of the Revised Statutes and shall be subject to the provisions thereof: *Provided,* That this section shall not apply to vessels having on board only inflammable or combustible liquid for use as fuel or stores * * *."

or damage out of which the said claim arose * * *.' [Emphasis added by the trial judge.]

"Since suit was not brought within one year, this claim is procedurally barred. RCW 48.12.200(1) (3) Heffner [Hefner] v. Great American Ins. Co., 126 Wash. 390; 218 Pac. 206 (1923). Hassett v. Penn. Fire Ins. Co., 150 Wash. 502, 273 Pac. 145 [745] (1929)."

In reply to the authorities relied upon by the court, and the brief, and in an attempt to show error in the district court, appellants, at page 15 of their reply brief state:

"Insurers have cited no English authority in the point and, therefore, Phoenix Ins. Co. of Hartford v. De Monchy, (1929) 45 T.L.R. 543, 35 Com.Cas. 67, quoted at page 51 of [appellants'] main brief, must be deemed conclusive and the Buffalo time bar provision must be disregarded."

Appellants rely heavily upon the Phoenix case involving turpentine that evaporated in transit. In that case, the policies contained the time clause limitation, but there was none in the certificate. It was held the certificate was the actual insurance, and the time clauses not contained in it could not be read into it (p. 544). The judgment was affirmed by the Lords. At page 544 it is stated:

"It follows, I think, that all clauses of the policy which are essential to the contract of marine insurance must be read into the certificate, but beyond that there is no necessity to go. The condition in question is a collateral stipulation [a one year

contractual time bar clause] imposing a condition precedent. It has nothing particular to do with insurance, but might be applied to any contract. Common sense and fairness revolt against the idea of this being enforced against the holder or indorsee of the certificate * * [who could never have seen the policy]." [21]

The trial court in the Phoenix case had not held, as the district court did here, that the limitation clause was part of the actual contract between the parties. The appellate court there was affirming the court of appeals (44 Times L.R. 364). Had the lower court held there as the trial court did here, what would the appellant there have argued?

Having held the clause to be valid and an essential part of the contract entered into (for which there was ample support in law), we do not believe the district court's conclusion on this point was erroneous.

■ B. Was it proper for the district court to deny appellants a trial by jury? This is a matter within the discretion of the district court, and we conclude no abuse of said discretion is shown. However, because of the importance of this issue, we feel it must be discussed at some length. Our task is further enlarged by a complicated and confusing state of the record, and the manner in which this issue was presented to the trial court. We recognize that since "a right to trial by jury is a constitutional one * * * [the court's] discretion is very narrowly limited," and "must, wherever possible be exercised to preserve jury trial" [22]—yet the Rules

---

21. The factual situation was, to say the least, unusual. Lord Atkin said:

"The so-called policy is in fact misnamed. It does not insure anything, it neither defines the subject matter insured, except that it is merchandise, principally * * * naval stores, nor the voyage insured, nor the sum insured. It is a promise during a certain time to issue policies to the named assured against named risks, but the completed policies named in the certificates are to be capable of varying the conditions of the policy in accordance with written instructions given from time to time by the insurers. * * * The [limitation] clause is not one which binds the certificate holder." (Id. at 549.)

22. Beacon Theatres, Inc. v. Westover (1959) 359 U.S. 500, 510, 79 S.Ct. 948, 3 L.Ed.2d 988. As Mr. Justice Black,

of Civil Procedure mean something, and a limited judicial discretion must of necessity still exist.

The district court's "Memorandum Decision Re Applicable Law Jury Demand," at page 224 of the record, reads as follows:

"It is indisputable on the record that plaintiffs' demand for jury trial was untimely by a substantial margin and that this constitutes jury waiver under F.R.Civ.P. 38(d). Although allowed ample time and opportunity therefor plaintiffs have not made a showing which amounts to excusable neglect, inadvertence or mistake or other basis on which the court in its discretion should order jury trial under F.R.Civ.P. 39(b). Plaintiffs' motion for jury trial is denied; exception allowed."

Finding of Fact No. III supports the above decision.

It is undisputed appellants never perfected a jury demand in the district court under the Federal Rules of Civil Procedure. There is dispute as to whether a jury demand was perfected in the State court. The right to jury trial in the State court is governed by RCW 4.44.100. This statute expressly requires that a statement electing jury trial be both served *and* filed *and* a jury fee paid. Unless such statement "is filed * * * the parties shall be deemed to have waived trial by jury, and *consented* to a trial by the court." (Emphasis added.)

The jury demand was never *filed*. Federal Rules of Civil Procedure, Rule 38(d) requires that a jury demand be filed, and upon failure to do so, applies the penalty of a waiver of jury trial. Appellants now take the position they had established their *right* to a jury

trial in the State court action. They state in their reply brief (p. 15):

"Insurers caused to be inserted in the printed record certain material not in the record, and not in existence at the time of judgment, without leave of the court or notice to their adversaries."

This reference is to pages 51 to 53, inclusive, of the record, which contain an affidavit of appellees' counsel to which is attached a photostat of the Appearance Docket of some case pending in Pierce County, Washington, entitled "Mike Barovic (sic) [23] vs. L. Symes, et al." This photostat is described in the affidavit to which it was attached as "a certified copy of the Docket in case # 137440—entitled Pacific Queen Fisheries, a partnership, et al., v. L. Symes." We assume that this is an accurate photostat of the Appearance Docket of the Pierce County Superior Court in one of the cases then before it and now before us (now No. 17460) on appeal.

When appellants urged the jury question in their opening brief, (pp. 52–54) they took the position, unlike the one taken before the trial judge, that serving a demand for jury trial, and paying the required fee "completed the formalities required of a plaintiff for a right to trial by jury under the Rules of Procedure of the Superior Court for the State of Washington."

Appellees urged first that failure to file the demand for a jury trial waived or forfeited any right to it; and *secondly*, that the appellants in the federal courts (a) had neither filed a timely demand for a jury trial, and (b) had never urged that they had "completed all formalities" required by the State court, and hence had not acquired any "right" to a jury trial. The issue not having been raised below could not be

the author of the Beacon Theatres case decision, said with respect to its holding: "Beacon Theatres requires that any legal issue for which a trial by jury *is timely and properly demanded* be submitted to a jury." (Emphasis added.)

Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44.

23. Mike Barovic, of course, here named as a plaintiff, was one plaintiff and a partner of Pacific Queen Fisheries.

raised on this appeal. In other words, appellants asked for a jury trial (under Rule 39(b)—discretion of trial judge), but never took the position, they were entitled to it as a matter of right. They did not deny a technical waiver had occurred, merely that there had been "no conscious waiver." (Supp.Tr. of September 26, 1960, p. 45.)

To substantiate appellees' position, they filed in this court on March 29, 1962, a motion to augment the record, in the following particulars:

1. The Notice of Argument dated September 6, 1960.

2. The Notice of setting cause for trial.

3. Portions of defendant-appellees' Reply Brief, opposing jury trial, filed September 19, 1960.

4. Plaintiff-appellants' Memorandum in support of jury trial.

5. The Transcript of proceedings before the trial judge, had on September 26, 1960.

Appellants here had no objection to such augmentation—provided they were permitted to augment the record by an affidavit, made by the judge of the Washington State court to which was attached his rough calendar for November 21, 1960; and a reporter's transcript of the proceedings had before him on September 12, 1960. On that date the State court agreed to set the case for trial late in November. On September 12, 1960, Mr. Copeland, counsel for appellants, there questioned the judge: "I would assume about a *four-day jury trial?*" and Mr. Stephan, counsel for present appellees, stated: "I think it would be more like ten, if we have a jury. We have no jury in the federal court; the federal court is going to dispose of all of this matter."

There being no objection to the augmenting of the record, by either side, this court granted each side leave to augment.

Between the September 12, 1960 appearance and the November 21, 1960 "future setting" for a trial by jury in the State court, the federal court held a hearing on the matter. This was on September 26, 1960. On that date, Mr. Dow, appearing as counsel for appellants, moved the federal court "that we remove our State court case to this Court and consolidate the two for purposes of trial." This was agreed to by counsel for defendant appellees, and approved by the court. The litigants then presented authorities and argument on that same date with respect to appellees' request for a jury trial. This was a 39 (b) motion addressed to the sound discretion of the court. In their memorandum of law in support of such motion, Pacific Queen significantly conceded:

"* * * plaintiffs may not have a jury trial as of right. However, this Court in its discretion may upon proper application grant an order placing the matter upon the Civil Jury Calendar. The authority for such an order lies in Rule 39(b) of the Federal Rules of Civil Procedure * * *. Plaintiffs have moved the court *for such an order* and submit this brief in support of their application." (Emphasis by appellants.) (Augmented Record, Item 4, pp. 1–2.)

As a result, the district court had no notice of the now claimed *right* to jury in the State court. At no time did appellants file a jury demand as required by Federal Rules of Civil Procedure 5(d) and 38(d). Appellants now raise an issue never raised in the trial court. Furthermore, it will be recalled that one case on this appeal (No. 17,461) had originally been filed in the State court and was removed to the district court which denied remand; the other case on this appeal (No. 17,460), originally filed in the State court, and afterwards removed to the Federal court, remanded back to the State court was then by motion and stipulation (see note 24, infra) returned to the Federal court and consolidated with No. 17,461. No timely

jury demand was made in the "No. 17,-461" case, then pending in the Federal court; appellants do not contend otherwise. With this in mind, the stipulation bears out the fact that the district court neither committed error nor abused its discretion. Appellants entered into the significant stipulation, which appears in the margin,[24] with respect to the cases.

Under all the circumstances here appearing, we believe the district court properly consolidated the cases as non-jury cases. We hold there was no abuse of discretion.

C. Was the district court correct in holding appellants Hull, Peck and Royer to be partners in Pacific Queen Fisheries, and necessary parties whose admissions would be binding on appellant Pacific Queen? We hold it was. We think this is adequately demonstrated by a reading of Conclusion of Law X (R. 285–286).

However, appellants do not deem the point worthy of extensive discussion because "we know of no damaging 'admissions' made by any of these three men as referred to in the lower court's Finding of Fact X * * *." We do not consider that this point warrants further discussion. Thus, even if error, the error is harmless.

Finding no error, we affirm the judgment below for the reasons stated above.

24. The stipulation reads:

"1. That these causes shall be consolidated for trial, and that since the issues and contentions of the parties are the same or similar save and except as to the fact that suit is brought upon different policies of insurance, the pre-trial order heretofore entered in cause No. 2543 and any and all supplements or amendments thereto, shall be deemed and considered as applicable to and controlling upon the issues of this case except insofar as it shall be necessary during the course of the trial to indicate verbally or in writing that some such provision is not entirely applicable or that some additional proof or provision should be made other than contained in the pre-trial order, it being the understanding and the purpose of this stipulation to avoid the necessity of the long and laborious work of another pre-trial order, it being the contemplation of the parties that there can be very little if any differences other than clerical or mechanical as the same may be made applicable to certain different documents that afford the basis for the insurance and that this stipulation is made for the convenience of counsel and the Court to avoid unnecessary paper work in the obtaining of a pre-trial order, but at the same time eliminate any excessive amount of trial work which would be eliminated by the pre-trial order but at the same time to not foreclose either party from the right or privilege of producing any evidence or making any contention which is necessary to the proper presentation of that party's case by reason of the fact that the pre-trial order is not separately prepared and is incorporated by reference to this stipulation."